Filed 5/31/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| RAND RESOURCES, LLC et al., | B264493 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC564093) |
| v. | |
| CITY OF CARSON et al., | |
| Defendants and Respondents. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Michael L. Stern, Judge.  Reversed.

Huang Ybarra Singer & May, Joseph J. Ybarra, Aaron M. May and Carlos A. Singer for Plaintiffs and Appellants.

Aleshire & Wynder, Sunny K. Soltani, Anthony R. Taylor and Christina M. Burrows for Defendants and Respondents City of Carson and James Dear.

Tamborelli Law Group and John V. Tamborelli for Defendants and Respondents Leonard Bloom and U.S. Capital LLC.

_____

The trial court granted anti-SLAPP motions against a city's exclusive agent in its action for breach of, and interference with, the agency contract and related causes of action. The agent contends the defendants' actions did not arise from an act in furtherance of their right of free speech or to petition for redress of grievances and were not in connection with an issue of public interest, and therefore fell outside the scope of the anti-SLAPP statute. We agree and reverse.

## BACKGROUND

### 1. Factual background and First Amended Complaint (FAC)

### a. Rand's early efforts, federal litigation, and the ENA

Richard Rand (Rand) is the sole member of plaintiff Rand Resources, LLC (Rand Resources) and the managing and controlling member of plaintiff Carson El Camino, LLC, which is the assignee of Rand Resources with respect to its rights under the Exclusive Agency Agreement (EAA) at the center of this action. El Camino is also the owner of 12 acres of land near the intersection of the 405 and 110 freeways that was part of a 91-acre site that the parties, including the City of Carson (City), were interested in developing as a sports and entertainment complex, including a football stadium, with the goal of persuading a National Football League (NFL) franchise to make the site its home.

At an early point in Rand's dealings with the City's Redevelopment Agency, the City's then-mayor demanded a bribe from Rand, but Rand refused to pay. He instead sued the City and the Redevelopment Agency in federal court for civil rights violations and prevailed in a jury trial in December of 2006. (*Rand v. City of Carson et al.* (C.D.Cal., Dec. 11, 2006, No. CV 03-1913 GPS (PJWx)).) The City appealed and Rand cross-appealed on the issue of damages. While the appeal was pending, the parties reached an agreement in which the Redevelopment Agency granted Rand Resources the exclusive right to negotiate with the City and Redevelopment Agency with respect to the development of the sports and entertainment complex. In exchange, Rand agreed to stay his cross-appeal and refrain from enforcing the judgment. The parties' arrangement was reflected in an Exclusive Negotiating Agreement (ENA). The parties thereafter amended

2

the ENA and extended it pursuant to its terms.  In August of 2012 they entered into a new ENA.  The FAC in the present case alleges that Rand "worked diligently to develop a sports/entertainment complex on the site, including but not limited to efforts aimed at developing the site as the location for a new NFL stadium."

### b. The EAA

On September 4, 2012, after the dissolution of all redevelopment agencies in the state in 2012, the City entered into the EAA with Rand Resources.  In the EAA, the City appointed Rand Resources "as its sole and exclusive agent" for a two-year period ending September 4, 2014, for the purposes of "coordinating and negotiating with the NFL for the designation and development of an NFL football stadium . . . in the City," "facilitating the execution of appropriate agreements between the NFL and the City documenting the designation and development of the Property [(the 91-acre site)] as an NFL Football Stadium," and "performing such other services as may be reasonably requested by City in connection with this Agreement."  It further provided:  "During the Term of this Agreement, City's appointment of [Rand Resources] as its agent for the Authorized Agency shall be exclusive such that (i) [Rand Resources] shall be the sole person designated as the agent of City for the Authorized Agency during the Term, and (ii) City shall not engage, authorize or permit any other person or entity whomsoever to represent City, to negotiate on its behalf, or to otherwise act for City in any capacity with respect to any subject matter falling within the Authorized Agency.  In addition, City shall not itself, through its officials, employees or other agents, contact or attempt to communicate with the NFL or any agent or representative of the NFL or accept offers from the NFL or its agents or representatives to communicate directly with the NFL or any of NFL's designated agents or representatives (including, without limitation, its legal counsel) with regard to the Authorized Agency.  From and after the date of this Agreement and throughout the Term, City covenants and agrees to refer exclusively to Agent all offers and inquiries received by City from the NFL and its agents or representatives."

3

The EAA provided it could be "extended by the mutual written consent of the parties for up to two (2) additional periods of one (1) year. The City's City Manager, or designee, may grant such extension upon receipt of an extension request and a report from [Rand Resources] indicating in specific terms the efforts of [Rand Resources] to date and the anticipated steps to be undertaken in the extension period for completion of the applicable planning and negotiation phases of the Project. To the extent that such efforts are reasonably determined by the City to be consistent with the requirements of this Agreement, the City shall grant such extension request. The granting of any extension pursuant to this Section . . . shall be within the sole and unfettered discretion of the City."

Plaintiffs allege that Rand and Rand Resources "worked diligently on bringing an NFL franchise to Carson" and spent "hundreds of thousands of dollars and a significant amount of time" in doing so. They retained numerous advisors, attorneys, engineers, and others to help them "deal with the NFL and issues regarding the potential sites," portions of which were contaminated with hazardous materials and required remediation. They hired architects to draft plans for a stadium, met with NFL executives and team owners, and created "promotional and marketing materials detailing the merits of Carson as the site for an NFL franchise and new stadium." They also met with investors, including in China, and met and communicated with City officials to discuss their efforts. Plaintiffs allege their efforts "raised the NFL's interest in Carson as a potential site for an NFL franchise," as shown by statements by the league regarding their "strong interest" in Carson.

### c.    City allows Bloom defendants to act as its agent

In April of 2013, Rand and the City reached a settlement regarding the federal court action. Soon thereafter, "the City stopped adhering to the terms of the EAA" and allowed defendants Leonard Bloom and U.S. Capital LLC (collectively the Bloom defendants) to begin "acting as the City's agent and representative" with respect to the NFL and development of the sports and entertainment complex. The FAC alleges the

4

Bloom defendants did so with knowledge of the EAA and its terms and discussed with Mayor James Dear how to "'get around' the EAA." "[W]ith the knowledge and support of representatives of the City, including Mayor Dear," the Bloom defendants contacted NFL representatives and purported "to be agents of the City with respect to bringing an NFL franchise to Carson." The Bloom defendants, the City, and Dear made efforts to conceal their meetings and communications with one another, including using confidential e-mails to discuss matters related to the prospective stadium. Dear also sent the Bloom defendants private and confidential City of Carson documents relating to development of a stadium, and Bloom and a colleague "routinely ghostwrote letters for Mayor Dear that [he] put on his official letterhead and sent to third parties as part of their efforts to undermine the EAA." Bloom also used "promotional materials that were derivative of those created and used by Rand in connection with meetings with NFL officials and others." In August of 2014, with knowledge that Rand Resources was the named agent in the EAA, Bloom created a new entity for himself that he named Rand Resources, LLC.

After several City employees and a representative of the San Diego Chargers informed Rand of the Bloom defendants' activities, Rand asked Dear about Bloom. Dear falsely denied knowing Bloom or of his activities.

Before the expiration of the original term of the EAA, Rand Resources submitted a written request for its extension along with "a report detailing its efforts to date and the anticipated steps to be undertaken in the extension period." Bloom met with Dear and at least one City councilperson "to discuss and conspire about how to breach the EAA and not extend it." Before the extension was voted on, Rand and his attorney met with City Attorney Bill Wynder and the City manager. Wynder stated the City would not extend the EAA and explained "that the City had been 'walking on eggshells' with Leonard Bloom and 'did not need' Rand anymore." Even though the City's Economic Development Commission voted unanimously to extend the EAA, "the City" voted not to extend the EAA.

5

Plaintiffs allege the defendants' actions "eviscerated" the exclusivity of the agency under the EAA, which was "necessary for credibility in dealing with NFL officials and provided Plaintiffs with the potential of earning significant payments should an NFL franchise decide to move to Carson and build [a] stadium there." Plaintiffs were damaged through "hundreds of thousands of dollars in expenditures . . . and the lost opportunity to receive a multi-million dollar commission," as well as the loss of "other potential development opportunities" with respect to their real property and damage to their reputation as a real estate developer.

### d.    FAC

Plaintiffs filed their FAC in February of 2015.  Their first cause of action alleged breach of contract against the City.  It alleges the City breached the EAA by (1) "not adhering to its promise to make Rand the exclusive agent of the City" by engaging, authorizing, and permitting the Bloom defendants to represent the City and negotiate on its behalf with respect to bringing an NFL team and stadium to the City, and (2) failing to grant the request to extend the EAA.

Plaintiffs' second cause of action, also asserted against the City only, alleges tortious breach of contract:  "The City's breach of the EAA was done willfully intentionally, and accompanied by and breached through acts of fraud and deceit." Specifically, they allege the City "took actions to cover up and conceal its breach of the EAA" from plaintiffs and "conspired with and acted in concert with" the Bloom defendants to breach the EAA and cover up the breach.  Plaintiffs cite defendants' secretive meetings and communications, Dear's denial of knowledge of Bloom and his actions, and Wynder's false representation before the parties entered into the EAA that "so long as Rand showed reasonable progress with respect to bringing an NFL franchise to Carson, the EAA would be renewed."

Plaintiffs' third cause of action is promissory fraud, also against only the City.  It is based upon the aforementioned promise made by Wynder in August of 2012, acting on behalf of the City, "that, even though the EAA only initially provided for a term of two

6

years, the City would extend the EAA for the two years beyond that period, just as it had with the ENA, so long as Rand showed reasonable progress with respect to bringing an NFL franchise to Carson." Absent this promise, plaintiffs would not have entered into the EAA. The cause of action alleges "Wynder, on behalf of the City, made this promise having no intention at the time to honor it but rather to deceive and induce Rand into entering the EAA."

The fourth cause of action, fraud, is asserted against the City, Dear, and the Bloom defendants. Although it incorporates by reference all prior allegations of the FAC, it specifically realleges the efforts of the City, Dear, and the Bloom defendants to "hide and conceal the City's breach of the EAA and Bloom's interference with the EAA . . . with the intent to deceive Rand and induce Rand to continue to abide by the EAA and not sue them." It further realleges that "Bloom took steps to make it appear that he was affiliated with and controlled Rand Resources," and Dear denied knowledge of Bloom. Plaintiffs allege they relied upon "the fraudulent actions and false representations" by continuing to expend resources in attempting to bring an NFL franchise to the City.

The fifth cause of action is intentional interference with contract, asserted against the Bloom defendants. It alleges the Bloom defendants "knew of the existence of the EAA and intended to interfere with Plaintiffs' rights under the EAA or knew that [their] actions were substantially certain to interfere with" those rights. "As a result of [the Bloom defendants'] interference, the City breached the EAA by, among other things, violating the exclusivity provisions at the heart of the EAA and refusing to extend the term of the agreement."

The sixth cause of action alleges intentional interference with prospective economic advantage by the Bloom defendants. It alleges the Bloom defendants "knew of the EAA and Plaintiffs' reasonable expectation that the term of the EAA would be extended and intended to interfere with Plaintiffs' prospective economic advantage from such extension, including by using as [their] own promotional materials created by Plaintiffs, at great time and expense."

7

### 2.     Anti-SLAPP motions and trial court's ruling

The City and Dear filed a special motion to strike the second through fourth causes of action pursuant to Code of Civil Procedure section 425.16,[1] also known as an anti-SLAPP motion.  Simultaneously, the Bloom defendants filed their own anti-SLAPP motion seeking to strike the fourth through sixth causes of action.[2]  Plaintiffs sought leave to conduct discovery to rebut the motions and moved to continue the hearing on the motions, but the trial court denied their ex parte application without explanation.  Plaintiffs nonetheless opposed both motions and included evidence in support of the allegations of the complaint, including numerous e-mails between Dear or City employees and Bloom or persons acting on behalf of the Bloom defendants that apparently pertained to matters within the scope of Rand Resources's exclusive agency.

The trial court granted both motions in their entirety.  Citing *Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219 (*Tuchscher*), the trial court concluded that section 425.16 was applicable to plaintiffs' case because "communications involving the proposed development of such commercial property fall into the 'matter of public interest' portion of the statute [subdivision (e)(4)] and, as such, they need not be made in connection with an issue under consideration or review by a legislative, executive, or judicial body."  The court nevertheless went on to conclude that, with respect to the Bloom defendants, the statements alleged in the fraud cause of action were made in connection with a legislative proceeding.  The court further concluded that plaintiffs had not met their burden at the second step of the analysis to demonstrate a probability of prevailing on their claims.  The court therefore granted both motions and stated that the defendants were entitled to attorney fees pursuant to section 425.16, subdivision (c).  All defendants subsequently

---

[1] Undesignated statutory references pertain to the Code of Civil Procedure.

[2] With respect to the applicability of section 425.16, the motions were nearly identical.

8

filed motions for attorney fees, but the appellate record does not include any ruling upon these motions.

On May 26, 2015, the trial court entered "partial judgment" in favor of Dear, Bloom, and U.S. Capital, and later stayed the action, apparently pending resolution of this appeal.

## DISCUSSION

**1.    Pertinent principles regarding anti-SLAPP motions**

**a.    Statutory framework**

The Legislature enacted section 425.16, the anti-SLAPP statute, "out of concern over 'a disturbing increase' " in civil suits "aimed at preventing citizens from exercising their political rights or punishing those who have done so." (*Simpson Strong-Tie Co., Inc. v. Gore* (2010) 49 Cal.4th 12, 21 (*Simpson*).) " ' "While SLAPP suits masquerade as ordinary lawsuits such as defamation and interference with prospective economic advantage, they are generally meritless suits brought primarily to chill the exercise of free speech or petition rights by the threat of severe economic sanctions against the defendant, and not to vindicate a legally cognizable right." ' " (*Ibid.*)

The statute provides for "a special motion to strike to expedite the early dismissal of these unmeritorious claims." (*Simpson*, *supra*, 49 Cal.4th at p. 21.)  The motion involves a two-step process.  First, the defendant must make a prima facie showing that the plaintiff's cause of action arises from an act by the defendant in furtherance of the defendant's right of petition or free speech in connection with a public issue.  (§ 425.16, subd. (b)(1).)  If the defendant succeeds in making this showing, the court must then consider whether the plaintiff has demonstrated a probability of prevailing on the claim.  (*Ibid.*)  If not, the motion should be granted.  (*Ibid.*)  In ruling on the motion, "the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2).)

Subdivision (e) of section 425.16 provides that an " 'act in furtherance of a person's right of petition or free speech . . . in connection with a public issue' includes:

9

(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

### b. Determining the applicability of the statute to a cause of action

"Our Supreme Court has recognized the anti-SLAPP statute should be broadly construed [citation] and that a plaintiff cannot avoid operation of the anti-SLAPP statute by attempting, through artifices of pleading, to characterize an action as a garden variety tort or contract claim when in fact the claim is predicated on protected speech or petitioning activity. [Citation.] Accordingly, we disregard the labeling of the claim [citation] and instead 'examine the *principal thrust* or *gravamen* of a plaintiff's cause of action to determine whether the anti-SLAPP statute applies' and whether the trial court correctly ruled on the anti-SLAPP motion. [Citation.] We assess the principal thrust by identifying '[t]he allegedly wrongful and injury-producing conduct . . . that provides the foundation for the claim.' [Citation.] If the core injury-producing conduct upon which the plaintiff's claim is premised does not rest on protected speech or petitioning activity, collateral or incidental allusions to protected activity will not trigger application of the anti-SLAPP statute." (*Hylton v. Frank E. Rogozienski, Inc.* (2009) 177 Cal.App.4th 1264, 1271–1272.) "[T]he gravamen of an action is the *allegedly wrongful and injury-producing conduct*," i.e., " 'the *acts on which liability is based*,' " "not the damage which flows from said conduct." (*Renewable Resources Coalition, Inc. v. Pebble Mines Corp.* (2013) 218 Cal.App.4th 384, 387, 396 (*Pebble Mines*).)

The trial court must "distinguish between (1) speech or petitioning activity that is mere *evidence* related to liability and (2) liability that is *based on* speech or petitioning

10

activity.  Prelitigation communications or prior litigation may provide evidentiary support for the complaint without being a basis of liability." (*Graffiti Protective Coatings, Inc. v. City of Pico Rivera* (2010) 181 Cal.App.4th 1207, 1214–1215.)  "[T]he mere fact that an action was filed after protected activity took place does not mean the action arose from that activity for the purposes of the anti-SLAPP statute.  [Citation.]  Moreover, that a cause of action arguably may have been 'triggered' by protected activity does not entail that it is one arising from such.  [Citation.]  In the anti-SLAPP context, the critical consideration is whether the cause of action is *based on* the defendant's protected free speech or petitioning activity." (*Navallier v. Sletten* (2002) 29 Cal.4th 82, 89.)  "In other words, 'the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech.'" (*Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 670.)  Thus, the statute does not automatically apply simply because the complaint refers to some protected speech activities.  (*Martinez v. Metabolife Internat., Inc.* (2003) 113 Cal.App.4th 181, 187–188.)

        c.        **Determining whether a matter is a public issue or an issue of public interest**

"The statute does not provide a definition for 'an issue of public interest,' and it is doubtful an all-encompassing definition could be provided.  However, the statute requires that there be some attributes of the issue which make it one of public, rather than merely private, interest.  A few guiding principles may be derived from decisional authorities.  First, 'public interest' does not equate with mere curiosity.  [Citations.]  Second, a matter of public interest should be something of concern to a substantial number of people.  [Citation.]  Thus, a matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest.  [Citations.]  Third, there should be some degree of closeness between the challenged statements and the asserted public interest [citation]; the assertion of a broad and amorphous public interest is not sufficient [citation].  Fourth, the focus of the speaker's conduct should be the public interest rather

11

than a mere effort 'to gather ammunition for another round of [private] controversy . . . .' [Citation.] . . . A person cannot turn otherwise private information into a matter of public interest simply by communicating it to a large number of people." (*Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1132–1133.)

Three general categories of cases have been held to concern an issue of public interest or a public issue: "(1) The subject of the statement or activity precipitating the claim was a person or entity in the public eye. [Citations.] [¶] (2) The statement or activity precipitating the claim involved conduct that could affect large numbers of people beyond the direct participants. [Citations.] [¶] (3) The statement or activity precipitating the claim involved a topic of widespread public interest." (*Commonwealth Energy Corp. v. Investor Data Exchange, Inc.* (2003) 110 Cal.App.4th 26, 33 (*Commonwealth*).)

### d. Standard of review

We review the trial court's ruling on an anti-SLAPP motion de novo. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325.)

### 2. The trial court erred by granting both anti-SLAPP motions.

Plaintiffs contend the trial court erred in granting the defendants' anti-SLAPP motions because the gravamen of their complaint "is the City's breach of the EAA and the Bloom Defendants' interference with that contract, neither of which constitutes an act taken in furtherance of Defendants' constitutional right of petition or free speech." Plaintiffs further note that, to the extent the defendants rely upon the City's decision not to renew the EAA as a governmental proceeding under section 425.16, subdivision (e)(2), that decision occurred "well *after* Bloom had interfered with the Agreement and the City had breached it. The City's after-the-fact decision not to extend the EAA cannot somehow immunize Defendants from liability for acts taken *while the EAA was in place*. If it did, private contracts with municipalities would be virtually unenforceable." Plaintiffs also contend "the mere fact that bringing an NFL franchise to the City may be a matter of 'public interest' does not mean that the anti-SLAPP statute was triggered here.

12

Defendants still were required to demonstrate that the acts giving rise to the asserted liability constitute *protected activity*. . . . Defendants' liability is predicated on commercial conduct, not speech or petitioning . . . ."

Defendants, in contrast, contend that they made the prima facie showing required at the first stage of the analysis because "[t]he real estate development alleged in the FAC," including development of an NFL stadium in the City, is necessarily a matter of public interest within the scope of section 425.16, subdivision (e)(4). They further argue that the plaintiffs' claims fall within the scope of section 425.16, subdivision (e)(2) because "the EAA and the project as a whole were the subject of multiple legislative and other official proceedings," as shown by votes on the EAA by the City Council and the City's Economic Development Commission.

We agree with the plaintiffs, although with slightly differing rationale. Accordingly, we address only the first "prong" of section 425.16 analysis.

### a. Second cause of action (City only, tortious breach of contract)

The alleged wrongful conduct in plaintiffs' tortious breach of contract cause of action is the City's violation of the terms of the EAA by allowing someone other than Rand Resources to act as its agent with respect to efforts to bring an NFL franchise to the City. Thus, the cause of action is not premised upon protected free speech or the right to petition for redress of grievances, but upon the City's conduct in carrying out (or not) its contract with Rand Resources, with an allegation the breach of contract was accompanied by fraud in two forms: covering up the breach (including Dear's false denial about knowing Bloom), and a pre-agreement misrepresentation that the EAA would be renewed if Rand made reasonable progress. The mere fact that some speech occurred in the course of the asserted breach does not mean that the cause of action arises out of protected free speech. To hold otherwise would place the vast majority, if not all, civil complaints alleging business disputes and a large portion of tort litigation within the scope of section 425.16.

13

As for the City's contention that this cause of action (as well as each of Plaintiffs' other claims) alleges speech or conduct falling within the scope of section 425.16, subdivision (e)(4), we disagree. While having an NFL team, stadium, and associated developments in Carson is no doubt a matter of substantial public interest, plaintiffs' complaint does not concern speech or conduct regarding a large scale real estate development or bringing an NFL team to Carson and building it a stadium. It instead concerns the identity of the person(s) reaching out to the NFL and its teams' owners to curry interest in relocating to Carson. The identity of the City's representative is not a matter of public interest. In this regard, it is noteworthy that the City was not paying Rand Resources for its services or even reimbursing Rand Resources for its expenses. Furthermore, the particular communications alleged in the cause of action, i.e., the false representation that the EAA would be renewed, Dear's false denial about knowing Bloom, and communications entailed in meetings between the defendants, are also not matters of public interest. As the *Commonwealth* court stated, "Just because you are selling something that is intrinsically important does not mean that the public is interested in the fact that you are selling it." (110 Cal.App.4th at p. 34.) "The part is not synonymous with the greater whole." (*Ibid.*) An issue of public interest must "go beyond the parochial particulars of the given parties." (*Ibid.*)

The City's (and the trial court's) reliance upon *Tuchscher*, *supra*, 106 Cal.App.4th 1219, and *Ludwig v. Superior Court* (1995) 37 Cal.App.4th 8 is misplaced, for several reasons. Most significantly, both involved communications pertaining to an actual planned development, not the identity of the agent representing a party in negotiating matters that might lead to a development. In addition, in *Tuchscher*, the plaintiff conceded that the development in controversy was an issue of public interest. The appellate court stated, "We need not consider whether respondents' communications were made with an issue under consideration or review by a legislative, executive or judicial body, because there appears to be no dispute that the proposed development of Crystal Bay is a matter of public interest, and thus respondent's statements and writings

14

fall within subdivision (e)(4) of section 425.16." (106 Cal.App.4th at p. 1233.) Here, there is no such concession and the subject of the FAC is not communications pertaining to the actual development of real estate, but who represented the City in luring an NFL team to move to the City—a condition precedent to the development.

Somewhat similarly, the *Ludwig* court summarily concluded, without analysis, that development of an outlet mall, "with potential environmental effects such as increased traffic and impaction on natural drainage, was clearly a matter of public interest." (37 Cal.App.4th at p. 15.) Here, the FAC does not pertain to a real estate development project with such environmental or traffic effects, even though a redevelopment of contaminated land was an ultimate potential consequence of luring an NFL team to Carson. Thus, neither *Tuchscher* nor *Ludwig* supports, much less mandates, a conclusion that the subject matter of any cause of action in the FAC is a protected free speech or petitioning activity within the scope of section 425.16, subdivision (e)(4).

We also disagree with the City's contention that this cause of action (as well as each of Plaintiffs' other claims) alleges speech or conduct falling within the scope of section 425.16, subdivision (e)(2). The FAC alleges that the defendants' breach began soon after April 2013. The expiration, and thus the issue of renewal, of the EAA was more than one year away. Thus, the communications and conduct alleged in the cause of action were made solely in connection with the breach of the EAA, and not in connection with the issue of its renewal or any other issue under consideration or review by the City. Moreover, the particular communications alleged in the cause of action, i.e., the false representation that the EAA would be renewed, Dear's false denial about knowing Bloom, and communications entailed in meetings between the defendants were not made in connection with whether the EAA would be renewed or replaced with some agreement with the Bloom defendants. Indeed, Wynder's false representation that the EAA would be renewed was made before the EAA even went into effect.

For all of these reasons, the trial court erred by concluding the second cause of action fell within the scope of section 425.16.

15

### b. Third cause of action (City only, promissory fraud)

The alleged wrongful conduct in plaintiffs' promissory fraud cause of action is Wynder's false representation regarding renewal of the EAA, made in August of 2012, before the City and Rand Resources entered into the EAA, in order to induce Rand Resources to enter into the agreement. Although the basis of the cause of action is a statement, the gravamen of the cause of action is the manner in which the City conducted itself in relation to the business transaction between it and Rand Resources, not the City's exercise of free speech or petitioning activity. Moreover, for the reasons previously stated, the statement does not fall within the scope of section 425.16, subdivisions (e)(2) or (e)(4).

For all of these reasons, the trial court erred by concluding the third cause of action fell within the scope of section 425.16.

### c. Fourth cause of action (all defendants, fraud)

The gravamen of the fourth cause of action with respect to the City is, as with the second and third cause of action, the City's violation of the terms of the EAA by allowing someone other than Rand Resources to act as its agent with respect to efforts to bring an NFL franchise to the City and the manner in which the City conducted itself in relation to the business transaction between it and Rand Resources, not the City's exercise of free speech or petitioning activity. Moreover, the identity of the person representing the City in its efforts to lure an NFL team to the City is not a matter of public interest.

As to Dear, his statement that he did not know Bloom was not a matter of public interest and did not constitute free speech or petitioning activity protected by section 425.16.

As far as the Bloom defendants are concerned, the conduct at the heart of this cause of action is, in essence, their duplicitous attempts to pretend they were the City's official, authorized representative, including pretending they were Rand Resources by creating a new corporation with that name, with the apparent goal of deceiving those they dealt with to believe they were dealing with plaintiff Rand Resources. All of this pertains

16

to the Bloom defendants' private conduct of their own business, not their free speech or petitioning activities. They were not, for example, voicing criticism of a plan to have an NFL franchise base itself in the City or even a plan to build a stadium and sports-retail complex there. They were simply attempting to usurp, by any available means, the rights and role of plaintiff Rand Resources. Moreover, the identity of the person representing the City in its efforts to lure an NFL team to the City is not a matter of public interest, and the Bloom defendants' conduct commenced long before the consideration of the renewal of the EAA. To the extent the cause of action pertains to any communications, they are separate from any public issue and are instead unrelated private commercial conduct.

To the extent this or any other cause of action may be read as incorporating references to the decision not to renew the EAA, we conclude these are merely a reference to a category of evidence that plaintiffs have to prove the elements of their claims, including interference and damages, not the gravamen of the cause of action. "[W]e look to the allegedly wrongful and injurious conduct of the defendant, *rather than the damage which flows from said conduct*." (*Pebble Mines*, *supra*, 218 Cal.App.4th at pp. 396–397.)

For all of these reasons, the trial court erred by concluding the fourth cause of action fell within the scope of section 425.16.

**d.      Fifth and sixth causes of action (Bloom defendants, intentional interference with contract and prospective economic advantage)**

The alleged wrongful conduct at the heart of plaintiffs' interference with contract and interference with prospective economic advantage causes of action is again the Bloom defendants' efforts to usurp Rand Resources's rights and role under the EAA. As addressed with respect to the fourth cause of action, this conduct arises from the Bloom defendants' private conduct of their own business, not their free speech or petitioning activities. To the extent the cause of action pertains to any communications, they are separate from any public issue and are instead unrelated private commercial conduct. To

17

the extent this or any other cause of action may be read as incorporating references to the decision not to renew the EAA, we conclude these are merely a reference to a category of evidence that plaintiffs have to prove their claims, not the gravamen of the cause of action.

For all of these reasons, the trial court erred by concluding the fifth and sixth causes of action fell within the scope of section 425.16. Given our conclusion that none of the challenged causes of action fall within the scope of the statute, we need not address the second step, plaintiffs' probability of success.

## 3. Attorney fees

Although it is unclear from the appellate record whether the trial court actually awarded any of the defendants attorney fees pursuant to section 425.16, subdivision (c), the trial court's determination that defendants were entitled to such fees must be reversed because defendants are no longer prevailing parties on their motions. As the new prevailing parties, the plaintiffs, upon remand, may seek attorney fees incurred in opposing the anti-SLAPP motions.

## DISPOSITION

The May 7, 2015 order granting the anti-SLAPP motions is reversed.  Any and all orders by the trial court awarding attorney fees to the defendants, or any of them, are also reversed.  The May 26, 2015 "partial judgment" is vacated.  The action is reinstated against all defendants and remanded for further proceedings.  The plaintiffs may move for attorney fees incurred in opposing the anti-SLAPP motions.  Appellants are awarded their costs on appeal.

CERTIFIED FOR PUBLICATION.


LUI, J.

We concur:


CHANEY, Acting P. J.


JOHNSON, J.