# IN THE SUPREME COURT OF CALIFORNIA

RAND RESOURCES, LLC, et al.,
Plaintiffs and Appellants,

v.

CITY OF CARSON et al.,
Defendants and Respondents.

S235735

Second Appellate District, Division One
B264493

Los Angeles County Superior Court
BC564093

February 4, 2019

Justice Cuéllar authored the opinion of the court, in which Chief Justice Cantil-Sakauye and Justices Chin, Corrigan, Liu, Kruger, and Ashmann-Gerst[*] concurred.

---

[*] Associate Justice of the Court of Appeal, Second Appellate District, Division Two assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

RAND RESOURCES, LLC v. CITY OF CARSON

S235735

Opinion of the Court by Cuéllar, J.

The City of Carson (City) hired Rand Resources as its agent to negotiate with the National Football League (NFL) about the possibility of building a football stadium in the City. But Rand Resources eventually sued the City, its mayor, and rival developer Leonard Bloom after the City replaced Rand Resources with Bloom's company. The defendants responded by making a motion under a California statute designed to hasten resolution of certain disputes commonly characterized as strategic lawsuits against public participation (SLAPP) — lawsuits meant to chill the valid exercise of the public's rights to free speech and petition for redress of grievances. (Code Civ. Proc., § 425.16, subd. (a)[1]; see also *Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1055 (*Rusheen*).) Known as the anti-SLAPP statute, this law permits a defendant facing such a lawsuit to dispose of it through a special motion to strike one or more causes of action.

To describe the standard governing whether such a motion will succeed, the statute uses certain open-ended terms that raise nuanced questions of interpretation. A special motion may target "cause[s] of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the

_____

[1]    All further references to section 425.16 are to the Code of Civil Procedure.

1

California Constitution in connection with a public issue . . . , unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) A plaintiff who fails to persuade the court that he or she will probably prevail on the cause of action in question faces immediate dismissal of that cause of action.

The question we tackle here is whether the causes of action asserted in Rand Resources' dispute with the City and other defendants arise — as required to advance a valid anti-SLAPP motion — from the defendants' acts in furtherance of their right of free speech in connection with a public issue. What we find is they do not, aside from two discrete claims asserted against Bloom and his company. The relevant provisions of the anti-SLAPP statute procedurally protect statements made "in connection with an issue under consideration or review" by a legislative body (§ 425.16, subd. (e)(2)) or "any other conduct in furtherance of" the constitutional rights of petition or free speech "in connection with a public issue or an issue of public interest" (§ 425.16, subd. (e)(4)).

The City Council indeed reviewed whether to renew plaintiffs' contract with the City. But the anti-SLAPP statute protects defendants' statements made "in connection with" that issue only where such statements form the basis of plaintiffs' claims — that is, where the statements themselves constitute the wrongs giving rise to the complaint. In this case, the statements on which plaintiffs based their claims against the City defendants were either (1) unrelated to the issue considered by the City Council, or (2) made long before the issue came "under consideration or review" by the City Council. (§ 425.16, subd. (e)(2).) Under such circumstances, we hold that

these statements do not satisfy the requirements of section 425.16, subdivision (e)(2). In contrast, the statements attributed to the City's codefendants — Bloom and his company — are at the heart of the intentional interference claims asserted against these codefendants. These claims do fall within the ambit of subdivision (e)(2) because they rely on statements Bloom made "in connection with" the issue the City Council reviewed.

We also find that none of defendants' statements are within the scope of subdivision (e)(4) of the anti-SLAPP statute, save for those statements underlying the claims against Bloom. The parties in this case agree that the building of a sports stadium in the City of Carson to host an NFL team is — given the wide-ranging impact that a project of such scale could have on the City — an issue of public interest. Yet, except as to two claims, the conduct providing the basis for plaintiffs' claims has only the slightest bearing on whether or not, or how, the stadium should be built, nor does it concern any comparable matter of public interest. Instead, the conversations underlying plaintiffs' action relate only to who should be responsible for the ordinary functions associated with representing the City in the negotiations with the NFL — plaintiffs or the other entities named as the City's codefendants. Since there is no evidence or persuasive argument that the identity of the City's agents was a matter of public interest in this case, defendants' conduct does not qualify as protected activity under section 425.16, subdivision (e)(4).

Because we find some of plaintiffs' causes of actions are based on protected activities under subdivision (e)(2) and (e)(4) of section 415.26 but others are not, we affirm in part and reverse and remand in part the appellate court's judgment.

## I.

The plaintiffs in this case are Richard Rand and his companies, Rand Resources and Carson El Camino, LLC (collectively, Rand Resources or plaintiffs). The defendants are the City of Carson and its mayor, James Dear (collectively, the City defendants). Also named as defendants are Leonard Bloom and Bloom's company, U.S. Capital, LLC (collectively, the Bloom defendants). According to the complaint, in 2012, Rand Resources and the City entered into a contract in which Rand Resources was to act as the City's exclusive agent in negotiating with the NFL to build "a new, state-of-the-art sports and entertainment complex within the City" that would serve as the home stadium for an NFL team. All parties agree this development would have transformed the City and was a matter of public interest.

The agreement did not begin under the most auspicious circumstances. One of the City's earlier mayors had attempted to extort a bribe from Rand, and Rand, instead of paying, sued the mayor and the City. Rand won. While the case was on appeal, the City and Rand Resources entered into an agreement, the Exclusive Negotiating Agreement (ENA), which governed, inter alia, development of Rand Resources' own land within the parcel that the City was hoping to turn into a sports stadium. Rand Resources alleges the City extended the ENA multiple times.

In 2012, Rand Resources and the City entered into a new agreement, the contract underlying the dispute in this case. Under this agreement, the Exclusive Agency Agreement (EAA), Rand Resources became the City's exclusive authorized agent to negotiate with the NFL. The EAA obligated the City not to

"engage, authorize or permit any other person or entity whomsoever to represent City, to negotiate on its behalf, or to otherwise act for City" in "coordinating and negotiating with the NFL for the designation and development of an NFL football stadium." As part of that exclusivity condition, the City committed that it "shall not itself, through its officials, employees or other agents, contact or attempt to communicate with the NFL or any agent or representative of the NFL."

The EAA covered a term of two years but included an option for renewal. The extension provision states: "The term may be extended by mutual written consent of the parties for up to two (2) additional periods of one (1) year. The City's City Manager, or designee, may grant such extension upon receipt of an extension request and a report from Agent indicating in specific terms the efforts of Agent to date and the anticipated steps to be undertaken in the extension period for completion of the applicable planning and negotiation phases of the Project. To the extent that such efforts are reasonably determined by the City to be consistent with the requirements of this Agreement, the City shall grant such extension request. The granting of any extension pursuant to this Section 5 shall be within the sole and unfettered discretion of the City."

Plaintiffs allege that City Attorney Bill Wynder nonetheless made certain representations to Rand regarding extension of the EAA. In particular, plaintiffs assert that "[i]n August 2012 prior to Rand entering into the EAA, City Attorney Bill Wynder, acting on behalf of the City, told Mr. Rand that, even though the EAA only initially provided for a term of two years, the City would extend the EAA for two years beyond that period, just as it had with the ENA, so long as Rand showed reasonable progress with respect to bringing an NFL franchise

to Carson." Plaintiffs allege that "[p]ursuant to the EAA," they "expended significant time and resources in bringing an NFL team to Carson."

What prompted plaintiffs' lawsuit was that the City "stopped adhering to the terms of the EAA" around April 2013, within the initial term of the agreement and shortly after Rand settled his earlier litigation against the City. Rand alleges the City breached the exclusivity condition by, among other things, allowing the Bloom defendants to act as its representative in negotiating with the NFL.

Plaintiffs advance a variety of allegations to support these claims. The most pertinent ones involve speech and so potentially implicate the anti-SLAPP statute: allegations that the Bloom defendants and Mayor Dear "would send each other 'confidential emails' to discuss matters relating to building a stadium in Carson"; "Mayor Dear regularly sent Mr. Bloom and U.S. Capital, LLC private and confidential City of Carson documents relating to development of an NFL stadium"; and "Messrs. Bloom and Dear were involved in discussions with the City as to how to 'get around' the EAA."

With respect to the Bloom defendants specifically, plaintiffs allege, "Leonard Bloom and U.S. Capital, LLC, with the knowledge and support of representatives of the City, including Mayor Dear, were contacting NFL representatives and purporting to be agents of the city with respect to bringing an NFL franchise to Carson." In addition, "Mr. Bloom was using promotional materials that were derivative of those created and used by Rand in connection with meetings with NFL officials and others." In August 2014, Bloom also directed the vice president of his company "to form a new entity with the same

exact name as Mr. Rand's company that entered into the EAA, Rand Resources, LLC," presumably so that he could pass off the entity as Rand's company.

Plaintiffs also contend the City and Bloom defendants sought to hide their activities. In particular, plaintiffs allege that when Rand asked Mayor Dear about Bloom, "[t]he Mayor falsely told Rand that he did not know Mr. Bloom and was not aware of what, if anything, Mr. Bloom was doing with respect to the City and the NFL."

In July 2014, Rand Resources submitted to the City a request to extend the EAA for another year. After Rand Resources presented its request but before the City voted upon the matter, Bloom "met with Mayor Dear and at least one Carson councilperson . . . to discuss and conspire about how to breach the EAA and not extend it." Another meeting also took place days before the vote, this one attended by Rand and City Attorney Wynder. During this encounter, Wynder informed Rand that the City was not going to extend the agreement. Wynder further stated that "the City had been 'walking on eggshells' with Leonard Bloom and 'did not need' Rand anymore." According to plaintiffs, the City then committed another breach of the EAA when its City Council voted to deny the requested extension.

On the strength of these allegations, plaintiffs lodged a six-count complaint against the City, Mayor Dear, and the Bloom defendants. The first three causes of action are directed at the City and include breach of contract, tortious breach of contract, and promissory fraud. The next count of fraud is asserted against all defendants; and the last two counts — intentional interference with contract and intentional

interference with prospective economic advantage — are asserted against the Bloom defendants alone.

Defendants responded by making special motions to strike the second through sixth causes of action. The trial court granted their motions. The appellate court reversed, concluding the causes of action at issue did not arise from conduct in furtherance of defendants' constitutional rights of free speech in connection with a public issue, as defined by section 425.16. We granted review to clarify the scope of the statute.

## II.

## A.

The Legislature enacted section 425.16 in response to "a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." (§ 425.16, subd. (a).) These lawsuits prompted the Legislature to declare that "it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process." (*Ibid.*) To limit such risks, the anti-SLAPP legislation provides a special motion to strike "intended to resolve quickly and relatively inexpensively meritless lawsuits that threaten free speech on matters of public interest." (*Newport Harbor Ventures, LLC v. Morris Cerullo World Evangelism* (2018) 4 Cal.5th 637, 639.) In 1997, the Legislature amended the statute to provide that, directed to this end, the statute "shall be construed broadly." (§ 425.16, subd. (a); see also *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 59–60, fn. 3 (*Equilon*) [providing a history of the anti-SLAPP statute].)

The procedure made available to defendants by the anti-SLAPP statute has a distinctive two-part structure. (E.g., *Barry v. State Bar of California* (2017) 2 Cal.5th 318, 321; *Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*); *Simpson Strong-Tie Co., Inc. v. Gore* (2010) 49 Cal.4th 12, 21; *Equilon*, *supra*, 29 Cal.4th at p. 67.) A court may strike a cause of action only if the cause of action (1) arises from an act in furtherance of the right of petition or free speech "in connection with a public issue," and (2) the plaintiff has not established "a probability" of prevailing on the claim. (§ 425.16, subd. (b)(1) ["A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim"].)

A defendant satisfies the first step of the analysis by demonstrating that the "conduct by which plaintiff claims to have been injured falls within one of the four categories described in subdivision (e) [of section 425.16]" (*Equilon*, *supra*, 29 Cal.4th at p. 66), and that the plaintiff's claims in fact *arise* from that conduct (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1063 (*Park*)). The four categories in subdivision (e) describe conduct "in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue." (§ 425.16, subd. (e).) Defendants here contend plaintiffs' causes of action arise from two of those categories: communications "made in connection with an issue under consideration or review by a legislative body" (§ 425.16, subd.

(e)(2)) and "conduct in furtherance of the exercise of . . . free speech in connection with a public issue or an issue of public interest" (§ 425.16, subd. (e)(4).).

According to subdivision (e)(2) of section 425.16, "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law" is an "act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue." By requiring the communication to be in connection "with *an issue* under consideration or review" (§ 425.16, subd. (e)(2), italics added), the terms of subdivision (e)(2) make clear that "it is insufficient to assert that the acts alleged were 'in connection with' an official proceeding." (*Paul v. Friedman* (2002) 95 Cal.App.4th 853, 867.) Instead, "[t]here must be a connection with an issue under review in that proceeding." (*Ibid.*; see also *McConnell v. Innovative Artists Talent & Literary Agency, Inc.* (2009) 175 Cal.App.4th 169, 177 [same]; *Blackburn v. Brady* (2004) 116 Cal.App.4th 670, 677 [same].)

Alternatively, under subdivision (e)(4) of section 425.16, plaintiffs' causes of action must arise from defendants' conduct "in connection with a public issue or an issue of public interest." (See, e.g., *Tamkin v. CBS Broadcasting, Inc.* (2011) 193 Cal.App.4th 133, 142–143 ["A cause of action arises from protected activity within the meaning of section 425.16, subdivision (e)(4) if (1) defendants' acts underlying the cause of action, and on which the cause of action is based, (2) were acts in furtherance of defendants' right of petition or free speech (3) in connection with a public issue"].)

Not surprisingly, we have struggled with the question of what makes something an issue of public interest. (See *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1122 & fn. 9). The appellate courts, however, have derived some guiding principles that characterize a matter of public interest. We share the consensus view that "a matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest," and that "[a] person cannot turn otherwise private information into a matter of public interest simply by communicating it to a large number of people." (*Rand Resources, LLC v. City of Carson* (2016) 247 Cal.App.4th 1080, 1092 (*Rand Resources*), quoting *Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1132–1133.)

Here, the Court of Appeal properly identified three nonexclusive and sometimes overlapping categories of statements within the ambit of subdivision (e)(4). (See *Rand Resources, supra,* 247 Cal.App.4th at pp. 1091–1092.) The first is when the statement or conduct concerns "a person or entity in the public eye"; the second, when it involves "conduct that could directly affect a large number of people beyond the direct participants"; and the third, when it involves "a topic of widespread, public interest." (*Rivero v. American Federation of State, County, and Municipal Employees, AFL–CIO* (2003) 105 Cal.App.4th 913, 919; see *id.* at pp. 919–924.)

But to prevail on an anti-SLAPP motion, a defendant must do more than identify some speech touching on a matter of public interest. As we have explained, " 'the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech.' " (*Park, supra,* 2 Cal.5th at p. 1063 [holding that in deciding whether the "arising from" requirement is met, "courts should

consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability"].)  In other words, a claim does not "arise from" protected activity simply because it was filed after, or because of, protected activity, or when protected activity merely provides evidentiary support or context for the claim.  Rather, the protected activity must "supply elements of the challenged claim."  (*Id.* at p. 1064.)

In what follows, we consider counts two through six of the complaint within the above framework, asking, first, what conduct or statements underlie plaintiffs' claims; and second, whether the conduct was "in furtherance of" defendants' rights of petition or free speech "in connection with a public issue," as defined by either subdivision (e)(2) or (e)(4).  (§ 425.16, subd. (e).)

## B.

Plaintiffs' second and fourth claims allege tortious breach of contract against the City defendants and fraud against all defendants, respectively.  But they rest on allegations that are virtually identical.[2]  Although plaintiffs' third claim involves promissory fraud, it differs in material ways from the tortious breach of contract and fraud claims, so we treat it separately.

The crux of the second and fourth claims is that defendants concealed and affirmatively lied about the City's

---

[2]    We have established a "general rule precluding tort recovery for noninsurance contract breach," except to the extent the claim is simply a fraud claim by another name.  (*Freeman & Mills, Inc. v. Belcher Oil Co.* (1995) 11 Cal.4th 85, 102.)  Plaintiffs' tortious breach claim (count two) does appear to be a fraud claim by another name, and we thus refer to it as among plaintiffs' fraud-based claims.

breach of the exclusivity provision. (See *Park*, *supra*, 2 Cal.5th at p. 1060.) Plaintiffs allege that Mayor Dear and the Bloom defendants conspired to conceal the City's breach of the exclusivity provision by meeting in secret, exchanging "confidential emails," and "form[ing] a new entity . . . with the same exact name as Plaintiff Rand Resources" to "make it appear that [Bloom] was affiliated with and controlled Rand Resources." Plaintiffs also allege affirmative misrepresentations, including that Mayor Dear falsely told Rand that the mayor "did not know Mr. Bloom and was not aware of what, if anything, Mr. Bloom was doing with respect to the City and the NFL"; and that Wynder "falsely told Mr. Rand that, so long as Rand showed reasonable progress," the EAA would be renewed.

Among these allegations, Mayor Dear's and Wynder's false statements to Rand supply an element of the fraud-based claims: misrepresentation in the form of concealment, nondisclosure, or false representation.[3] These misrepresentations are not simply "evidence of liability or a step leading to some different act for which liability is asserted"; they are themselves the "wrong[s] complained of." (*Park*, *supra*, 2 Cal.5th at p. 1060.) They therefore satisfy the anti-SLAPP

---

[3] Mayor Dear's and Wynder's statements, not directly or indirectly attributable to the Bloom defendants, cannot supply the elements of a fraud claim asserted against the Bloom defendants. (See *City of Montebello v. Vasquez* (2016) 1 Cal.5th 409, 426 [distinguishing between activities of the municipal government and those of individuals, who happened to be officials of the municipality]; *Area 51 Productions, Inc. v. City of Alameda* (2018) 20 Cal.App.5th 581, 599–600 [agreeing that "*Vasquez* . . . 'emphasizes that each person's conduct is to be analyzed separately' "].)

requirement that the challenged claim "aris[e] from" defendants' conduct. (§ 425.16, subd. (b)(1).)

But these particular statements were not made "in connection with" either the issue before the City Council — the relevant legislative body, under subdivision (e)(2) — or an issue of public interest, under subdivision (e)(4). A closer look at the facts in light of these two statutory provisions shows why.

Consider first subdivision (e)(2). It is undisputed that the City Council met and took a vote affecting Rand Resources and the Bloom defendants. But the issue that the legislative body reviewed, considered, and voted on was whether to extend the EAA with Rand Resources in 2014. The City Council did not separately consider whether the Bloom defendants should be allowed to represent the City during the original term of the EAA, when the City was legally bound to use Rand Resources as its exclusive agent. Only communications made in connection with the renewal of the EAA — what the City Council actually considered — constitute "written or oral statement[s] or writing[s] made in connection with an issue under consideration or review" by the City Council. (§ 425.16, subd. (e)(2).) Plaintiffs present no other rationale for treating statements that are the basis of these claims as covered by subdivision (e)(2). Statements concerning anything else at issue in these claims, including those reflecting or concealing a breach of the EAA's exclusivity provision, fall outside the scope of this subdivision.

As to subdivision (e)(4), the parties agree that building an NFL stadium in the City is a matter of public interest. But defendants' speech concerned only the narrower issue of *who* should represent the City in the negotiations with the NFL. The affirmative misrepresentations, for instance, concerned only the

falsehoods that Mayor Dear did not know Bloom and was not aware of his involvement in the NFL negotiations, and that the City would continue to let Rand be its exclusive agent if his company made "reasonable progress." Neither of these statements was directed to the public issue of whether to "hav[e] an NFL team, stadium, and associated developments in Carson" or what trade-offs might be entailed in the process. (*Rand Resources*, *supra*, 247 Cal.App.4th at p. 1093.) Rather, what Mayor Dear and Wynder misrepresented — the issue "in connection with" their statements — was the identity of the City's agent in negotiations with the NFL.

Defendants disagree. "Speech about 'who' should represent the City in its NFL negotiations," they contend, "is just as protected as the speech 'of' that exclusive representation with the NFL" — "[t]he two kinds of speech are inextricably intertwined." What defendants fail to explain is how or why that is the case here, under circumstances where no obvious connection existed between the identity of the representative and a matter of public concern.

Defendants instead contend that this case is no different than *Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219 (*Tuchscher*). In *Tuchscher*, a developer had an exclusive deal with a city to "take preliminary steps and negotiate towards a development agreement for the creation of a mixed use real estate project . . . on certain bayfront property within the City." (*Id.* at p. 1227.) The parties did not dispute that the planned development was an issue of public interest. (*Id.* at p. 1233.)

Yet ultimately, the developer and city failed to reach an agreement on the project. The developer then sued, alleging the

defendants had interfered with the contract it had with the city. To support its claims, the developer introduced evidence of communications between the defendants, a rival developer, and the city. The developer's claims failed when the trial court granted the defendants' motion to strike under section 425.16 and the appellate court affirmed.

*Tuchscher* is distinguishable. Unlike any communications at issue here, those in *Tuchscher* pertained to the actual development of real estate — an issue of public interest — and formed the basis of the developer's claims. For instance, the challenged communications in *Tuchscher* included a letter from the rival developer to a defendant discussing such matters as the construction of " 'H St. Marina View Parkway,' " the demolition of " 'the existing structures on Port property,' " and the development of " 'residential housing on the adjacent fee owned property and commercial on Port property.' " (*Tuchscher*, *supra*, 106 Cal.App.4th at p. 1229.) If, as the Court of Appeal in *Tuchscher* said, these communications were "the activity underlying [the developer's] causes of action," *Tuchscher* is instructive mainly in its differences from this case. (*Id.* at p. 1233.)

No such communications relating to the building of the NFL stadium underlie plaintiffs' fraud-based claims. True: the defendants allegedly discussed building a stadium among themselves and with the NFL, while Bloom forged a deliberately confusing parallel entity. But those discussions and activities are not the misrepresentations that form the basis of the fraud. Rather, they serve as evidence that the City's statements to plaintiffs in denying Bloom's involvement were fraudulent. (See *Park*, *supra*, 2 Cal.5th at p. 1068.) In other words, communications exchanged between the City, the Bloom

defendants, and the NFL did not defraud plaintiffs; the City defendants' lie about their communications did. The lie, however, related only to the matter of *who* was representing the City. It had nothing to do with the merits of whether, how, and in what form the stadium should be built.

Defendants also argue that the issue of who served as the City's agent is a matter of public significance because "the better the negotiating party, the more likely that an NFL stadium would be delivered." As a preliminary matter, we reject the proposition that any connection at all — however fleeting or tangential — between the challenged conduct and an issue of public interest would suffice to satisfy the requirements of section 425.16, subdivision (e)(4). (See, e.g., *Jewett v. Capital One Bank* (2003) 113 Cal.App.4th 805, 814 [reversing the grant of a special motion to strike when "the attempt to connect the solicitations [the speech at hand] with an issue of public interest is tenuous at best"]; *Bikkina v. Mahadevan* (2015) 241 Cal.App.4th 70, 84 (*Bikkina*) [holding that the defendant's statements did not qualify as being in connection with an issue of public interest when the "statements were only remotely related to the broader subject of global warming or climate change"].)

At a sufficiently high level of generalization, any conduct can appear rationally related to a broader issue of public importance. What a court scrutinizing the nature of speech in the anti-SLAPP context must focus on is the speech at hand, rather than the prospects that such speech may conceivably have indirect consequences for an issue of public concern. (E.g., *Bikkina, supra,* 241 Cal.App.4th at p. 85 ["Here, the specific nature of the speech was about falsified data and plagiarism in two scientific papers, not about global warming"]; *Consumer*

*Justice Center v. Trimedica International, Inc.* (2003) 107 Cal.App.4th 595, 601 ["If we were to accept [defendant's] argument that we should examine the nature of the speech in terms of generalities instead of specifics, then nearly any claim could be sufficiently abstracted to fall within the anti-SLAPP statute"]; *Commonwealth Energy Corp. v. Investor Data Exchange, Inc.* (2003) 110 Cal.App.4th 26, 34 ["While investment scams *generally* might affect large numbers of people, the specific speech here was a telemarketing pitch for a particular service marketed to a very few number of people. . . . The speech was about [defendant's] *services*, not about investment scams in general"].)

We acknowledge that who precisely represents a city in sports franchise negotiations could indeed conceivably prove a matter of public interest. The identity of the speaker and the concededly important subject of the speaker's speech may, in some cases, be sufficiently linked so that the speech relating to the speaker's identity constitutes "conduct in furtherance of the exercise of the constitutional right of . . . free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).) But defendants' argument does not allow us to justify such a conclusion here. Defendants failed to suggest anything more than the most attenuated connection between the identity of the City's agent and a matter of public importance.[4] Nor is there anything in the record to support the

---

[4] The Court of Appeal noted that the City was not paying Rand Resources at all for its work as an agent. (*Rand Resources*, *supra*, 247 Cal.App.4th at p. 1094.) As such, we need not address the City's argument that "an EAA for the City's agent to negotiate the potential development of a large-scale project .

conclusion that the nature of the representation at issue involved more than routine functions ordinarily associated with such arrangements.  The failure to introduce such evidence is a material deficiency since defendants bear the burden at the first stage of the anti-SLAPP analysis.  (See *Baral*, *supra*, 1 Cal.5th at p. 396 ["At the first step, the moving defendant bears the burden of identifying all allegations of protected activity, and the claims for relief supported by them"].)  Defendants have not carried their burden.

Ultimately, the conversations underlying plaintiffs' claims focus on who should be responsible for day-to-day functions associated with representing the City, not whether an NFL stadium should be built.  Any furtive communications and behind-the-scenes machinations that *did* relate to the merits of an NFL stadium did not form the basis of plaintiffs' fraud claims.

Similar complications arise in plaintiffs' third claim, for promissory fraud against the City defendants.  Promissory fraud arises where a promise is made without any intention to perform.  (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638 ["A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud"].)  The claim arises directly from Wynder's statement to Rand, before he signed the EAA, that "so long as Plaintiffs showed reasonable progress with respect to bringing an NFL franchise to Carson, the EAA would be extended,"

. . fall[s] squarely within the definition of an issue of public interest [in part] because an agent could be paid a substantial amount of public funds for a project of great public significance."

followed by the City Council's denial of an extension to the EAA in 2014.

Because Wynder's promise supplies an element of the promissory fraud claim (*Rossberg v. Bank of America, N.A.* (2013) 219 Cal.App.4th 1481, 1498), it properly arises from speech that might be protected under section 425.16, subdivision (e)(2) or (e)(4). (See *Park, supra*, 2 Cal.5th at p. 1063.) Wynder's statement, unlike Mayor Dear's, did relate to the EAA renewal issue before the City Council.

Yet Wynder's statement was made in 2012, about two years before the renewal issue even came before the City Council.[5] Section 425.16, subdivision (e)(2) protects only those "written or oral statement[s] or writing[s] made in connection with an issue *under consideration or review*." (Italics added.) The subdivision thus appears to contemplate an ongoing — or, at the very least, immediately pending — official proceeding. Conversely, if an issue is not presently "under consideration or review" by such authorized bodies, then no expression — even if related to that issue — could be "made in connection with an issue under consideration or review." (§ 425.16, subd. (e)(2).)

What our appellate courts have declined to do is presume speech meets the requirements of section 425.16, subdivision (e)(2) when no official proceeding was pending at the time of the speech. (*Mission Beverage Co. v. Pabst Brewing Co., LLC* (2017)

---

[5]    Although the City Council approved the EAA in 2012, the parties do not dispute that the EAA is a valid contract, and defendants do not seem to have argued the City Council's approval of the EAA in 2012 was relevant until they briefed the case before us. We therefore do not consider the action of the City Council in 2012.

15 Cal.App.5th 686, 703 ["[P]reparatory communications do not qualify as a protected activity if future litigation is not anticipated, and is therefore only a 'possibility' — and this is true even if the communication is a necessary prerequisite to any future litigation."]; *Kajima Engineering & Construction, Inc. v. City of Los Angeles* (2002) 95 Cal.App.4th 921, 930 ["Kajima admits that 'a majority of the alleged acts occurred, if at all, *at or about the time [it] submitted its bid in early 1995.*' . . . Kajima was not exercising its right of petition at the time of the alleged acts; it was seeking to secure and working on a construction project"]; *People ex rel. 20th Century Ins. Co. v. Building Permit Consultants, Inc.* (2000) 86 Cal.App.4th 280, 285 [stating that "[a]t the time defendants created and submitted their reports and claims, there was no 'issue under consideration' pending before any official proceeding" and concluding "defendants failed to make a prima facie showing that the causes of action in the lawsuit arose from free speech or petition activity"].) We agree. "[U]nder consideration or review" does not mean any issue a legislative body may conceivably decide to take up months or years in the future. Wynder's statement was not made at the time or on the eve of the renewal decision; it was made years before the issue came under review by the City Council. Wynder did not even refer to the City Council's review process in his promise.

Nor does Wynder's 2012 promise relating to the EAA extension merit protection as speech "in connection with a public issue or an issue of public interest" under subdivision (e)(4). Even charitably reading Wynder's statement to encompass the identity of the City's agent — as we did in connection with plaintiffs' other fraud-based claims — defendants have not shown the issue to be one of public interest in this case. (Cf.

*Tuchscher*, *supra*, 106 Cal.App.4th at p. 1233 [finding claims within the ambit of subdivision (e)(4) where they arose from "communications to either the City or Lennar involving the proposed development of Crystal Bay and other bayfront property"].)

The City elliptically suggests another basis to strike the promissory fraud claim:  in 2014, days before the City Council considered the EAA extension, Wynder told Rand the City would not be extending the EAA because it "did not need" Rand anymore and had been "walking on eggshells" with Bloom. True:  the statement may be evidence the City was acting in bad faith.  It tends to show the City had already made up its mind not to extend the EAA, certainly, and it involves protected activity (speech in the form of an oral statement) relating to an issue considered by a legislative body (renewal of the EAA).  But this is not enough.

What the anti-SLAPP statute protects is speech that "provides the basis for liability." (*Park*, *supra*, 2 Cal.5th at pp. 1060, 1065 [instructing that in determining whether a cause of action arises from protected speech, courts must distinguish "between speech that provides the basis for liability and speech that provides evidence of liability"].)  This, the statement does not do.  Rather, the statement is analogous to the comments found in *Park* to fall outside the scope of section 425.16. (See *id.* at p. 1068 ["The tenure decision may have been communicated orally or in writing, but that communication does not convert Park's suit to one arising from such speech.  The dean's alleged comments may supply evidence of animus, but that does not convert the statements themselves into the basis for liability"].)  As was the case in *Park*, Wynder's 2014 statement — leaving aside any refusal to renew the contract — would not form the

basis of a promissory fraud claim. But the wrongful refusal to renew the contract, even without the prior communication, "surely could." (*Ibid.*)

## C.

We turn next to plaintiffs' claims against the Bloom defendants for intentional interference with contract and intentional interference with prospective economic advantage. Plaintiffs assert the Bloom defendants disrupted the relationship between plaintiffs and the City by interfering with plaintiffs' twin rights under the EAA and with plaintiffs' prospective economic advantage as the City's exclusive agent in negotiations. The two intentional interference claims share many elements — principally, an intentional act by the defendant designed to disrupt the relationship between the plaintiff and a third party. (*Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937, 944 [stating that an intentional interference with prospective economic advantage claim requires, among other things, "an intentional act by the defendant, designed to disrupt the relationship"]; *Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 55 [laying out the elements of an intentional interference with contract claim, one of which is that the defendant undertook " 'intentional acts designed to induce a breach or disruption of the contractual relationship' "].)

Plaintiffs advance two related arguments in making these claims. First, they contend the Bloom defendants "began acting as the City's agent" by "contacting NFL representatives" using Rand Resources' promotional materials and company name. Second, plaintiffs claim that "[a]fter Rand provided the City with its [EAA] extension request but before the City voted on

the extension," the Bloom defendants met with Mayor Dear and a councilmember to "conspire about how to breach the EAA and not extend it."

These two courses of conduct are more than "merely a reference to a category of evidence that plaintiffs have to prove their claims." (*Rand Resources, supra*, 247 Cal.App.4th at p. 1096.) The Bloom defendants' communications with the NFL served only as evidence of plaintiffs' fraud-based claims. Yet the very same communications constitute the conduct by which plaintiffs claim to have been injured in their intentional interference claims. (See *Park, supra*, 2 Cal.5th at p. 1064.) Similarly, although Bloom's secret communications with the City served as evidence of, or context for, claims based in fraud, those very communications *are* the interference now complained of in claims five and six. (See *ibid.*)

Moreover, the Bloom defendants' acts giving rise to plaintiffs' intentional interference claims were "in connection with a public issue," as defined in subdivision (e)(2) and (e)(4) of the anti-SLAPP statute. In contrast to Wynder's 2012 promise, the Bloom defendants lobbied Mayor Dear and a councilmember in 2014, "[a]fter Rand provided the City with its extension request but before the City voted on the extension." The Bloom defendants' communications — designed to influence the City's renewal decision while the renewal application was pending — are reasonably considered communications "in connection with an issue under consideration or review by a legislative . . . body" within the meaning of subdivision (e)(2). Indeed, they appear to be part of Bloom's lobbying the City not to renew the EAA and instead to use Bloom's company as the City's negotiator.

Along with their direct lobbying efforts, the Bloom defendants allegedly contacted and met with NFL representatives to discuss a possible NFL franchise in the City. Although in this case the identity of the City's exclusive agent was not a matter of public interest, the NFL's possible franchise relocation to the City *was* a matter of public interest. As in *Tuchscher*, the Bloom defendants' statements to the NFL regarding that matter of public interest are themselves statements "in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).)

In short, the Bloom defendants' communications with the NFL — like the communications at issue in *Tuchscher*, and unlike those in plaintiffs' fraud-based claims — formed the basis of the interference claims. Moreover, they were made "in connection with" the issue of bringing a football franchise to the City. Likewise, defendants' statements to Mayor Dear in 2014, while the EAA extension was pending before the City Council, also formed the basis of the interference claims and were made "in connection with" the issue of the EAA renewal that was before the City Council.

## III.

At the heart of this case is a dispute about who represents a city in its negotiations with a national sports league. Defendants in that dispute made a motion under the anti-SLAPP statute, which must be read broadly, in light of its remedial purpose. (See, e.g., *Equilon*, 29 Cal.4th at pp. 59–60.) But we do not understand it to swallow a person's every contact with government, nor does it absorb every commercial dispute that happens to touch on the public interest. What the statute

targets in a dispute like this one is liability premised on speech or petitioning activity "in connection with" a public issue.

While many of the claims at issue here — those alleging fraud, for instance — necessarily involved oral and written exchanges, few of those exchanges were themselves the "wrong[s]" about which plaintiffs complained. (*Park*, *supra*, 2 Cal.5th at p. 1060.) With two exceptions, the communications that *did* give rise to plaintiffs' claims were not made "in furtherance of" defendants' rights of free speech or petition "in connection with a public issue." (§ 425.16, subd. (b)(1).) Such speech does not merit anti-SLAPP protection.

Plaintiffs' intentional interference claims are different. Where other claims arose from speech peripherally related to the issue of public interest (the relocation of an NFL franchise) or tenuously involving an issue that would eventually come before a legislative body (the EAA extension), the intentional interference claims arose from the Bloom defendants' speech "in connection with" both the EAA extension in 2014 and the public interest issue of attracting the NFL to the City. The Court of Appeal erred in denying the motion to strike these two claims at the first stage of the anti-SLAPP analysis. The court's judgment in other respects was correct.

We affirm in part and reverse in part the Court of Appeal's judgment. We remand the matter for proceedings consistent with this opinion — including a determination of whether plaintiffs have established a probability of prevailing on their intentional interference claims. (§ 425.16, subd. (b)(1).)

**CUÉLLAR, J.**

**We Concur:**
**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**ASHMANN-GERST, J.**[*]

---

[*]     Associate Justice of the Court of Appeal, Second Appellate District, Division Two assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Rand Resources, LLC v. City of Carson

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 247 Cal.App.4th 1080
**Rehearing Granted**

_____

**Opinion No.** S235735
**Date Filed:** February 4, 2019

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Michael L. Stern

_____

**Counsel:**

Huang Ybarra Singer & May, Huang Ybarra Gelberg & May, Joseph J. Ybarra, Aaron M. May, Kevin H. Scott and Carlos A. Singer for Plaintiffs and Appellants.

Aleshire & Wynder, Sunny K. Soltani, William W. Wynder, Anthony R. Taylor and Christina M. Burrows for Defendants and Respondents City of Carson and James Dear.

Tamborelli Law Group and John V. Tamborelli for Defendants and Respondents Leonard Bloom and U.S. Capital LLC.

Burke, Williams & Sorensen, Thomas B. Brown and Amy E. Hoyt for League of California Cities and California State Association of Counties as Amici Curiae on behalf of Defendant and Respondent City of Carson.

Davis Wright Tremaine, Kelli L. Sager, Thomas R. Burke, Rochelle L. Wilcox and Dan Laidman for California Newspaper Publishers Association, Californians Aware, The Center for Investigative Reporting, First Amendment Coalition, The Reporters Committee for Freedom of the Press, A&E Television Networks, LLC, BuzzFeed, Inc. Cable News Network, Inc., CBS Corporation, Dow Jones & Company, First Look Media Works, Inc., The Hearst Corporation, NBCUniversal Media, LLC, The New York Times Company and The Motion Picture Association of America as Amici Curiae on behalf of Defendants and Respondents City of Carson, James Dear and Leonard Bloom.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Kevin H. Scott
Huang Ybarra Gelberg & May
550 South Hope Street, Suite 1850
Los Angeles, CA  90071-1560
(213) 884-4900

Anthony R. Taylor
Aleshire & Wynder
18881 Von Karman Avenue, Suite 1700
Irvine, CA  92612
(949) 223-1170

John V. Tamborelli
Tamborelli Law Group
21700 Oxnard Street, Suite 1590
Woodland Hills, CA  91367
(818) 710-3696