Filed 5/8/20

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| SUZANNE M. YANG et al., | |
| Plaintiffs and Respondents, | E071693 |
| v. | (Super.Ct.No. PSC1803755) |
| TENET HEALTHCARE INC. et al., | OPINION |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County. David M. Chapman, Judge. Reversed.

Davis Wright Tremaine, John R. Tate, Terri D. Keville, Karen A. Henry, and Kyle P. Klein for Defendants and Appellants.

Paul M. Hittelman for Plaintiffs and Respondents.

A licensed physician sued other medical entities and individuals for defamation based on statements made about her qualifications, competence, and medical ethics. In this anti-SLAPP appeal, we apply our Supreme Court's recent opinion in *FilmOn.com Inc. v. DoubleVerify, Inc.* (2019) 7 Cal.5th 133 (*FilmOn*), and conclude that the defendants' conduct arose from protected activity because their allegedly defamatory statements were made in connection with an issue of public interest. We further conclude

that the physician has not demonstrated a probability of prevailing on the merits. We therefore reverse the trial court, which denied the anti-SLAPP motion.

## I. FACTUAL AND PROCEDURAL HISTORY

In June 2018, plaintiffs and respondents Suzanne M. Yang and Doc Yang Medical Corporation sued defendants and appellants Tenet Healthcare Inc. doing business as John F. Kennedy Memorial Hospital (the hospital), its medical staff, and individual doctors (collectively, defendants), alleging defamation and nine other causes of action.[1] Defendants filed a special motion to strike (see Code Civ. Proc., § 425.16; all undesignated references are to the Code of Civil Procedure), also known as an anti-SLAPP motion, targeting only the defamation cause of action.[2] Because this appeal is limited to the anti-SLAPP motion, we discuss below only the facts pertaining to the defamation cause of action.

According to the complaint, Yang is a doctor with a general surgery practice in Indio. She alleges that since March 2016, defendants have conspired to drive her practice out of business in various ways, including by making defamatory statements. Doctors who referred cases to Yang, she alleges, were told they should not do so, and she accuses defendants of falsely stating to "healthcare providers," "medical practices," her "patients," and "members of the general public" that she did not have privileges for

[1] When we refer to Yang, we refer to either her individually or her and her medical corporation, as the context requires.

[2] "SLAPP is an acronym for 'strategic lawsuit against public participation.'" (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 732, fn. 1.)

2

certain procedures. Defendants also allegedly told these people that Yang "rendered care below applicable standards of practice," that "[h]er behavior and medical ethics were below applicable standards," that she was not "qualified or competent to practice her specialties," that she is "dangerous to [her] patients and to employees and members" of the hospital's medical staff, and that she was "'under investigation.'"

Defendants' anti-SLAPP motion contended that the statements were protected activity because they were made in connection with the hospital's peer review process (see § 425.16, subd. (e)(2); *Kibler v. Northern Inyo County Local Hospital District* (2006) 39 Cal.4th 192 (*Kibler*)) and because they were made in furtherance of the exercise of the right of free speech in connection with a public issue or an issue of public interest (see § 425.16, subd. (e)(4)). Defendants also contended that Yang cannot demonstrate a probability of prevailing because she consented to the peer review process that the statements were purportedly in connection with, and because the statements were privileged.

In opposing the motion, Yang submitted declarations from herself and others. In her declaration, Yang stated the following:

"4. In April and early May of 2016, I was approached at [the hospital] in Indio by several doctors, surgeons and anesthesiologists . . . ; by several OR [i.e., operating room] nurses, OR techs, and OR circulators; by Nurses from [intensive care unit], [emergency room], and employees of the [hospital] cafeteria, all offering their condolences, saying they heard I was under formal investigation.

"5.  When I asked them what they heard, some said insurance fraud; all said doing Plastic Surgery without permission.

"6.  Neither in or about March-April 2016, when I first learned of defendants' false statements that I was 'under investigation[,'] nor at any time before or thereafter did I receive notice of any time or form from [the hospital or] its Medical Staff . . . that there was then, or at any time, an investigation concerning me . . . ."

Other affidavits submitted with Yang's opposition focused on events in the same period of time.  Araceli Olmos, one of Yang's employees, stated that "[s]ince March of 2016, I have had numerous conversations with [hospital] administrators . . . by each of whom I was told Dr. Yang was under investigation for fraud, for doing more surgery than she received consent for; for illegally changing her consent forms, [and] for performing surgeries she was not privileged to perform."  Olmos stated that on March 14, 2016, she went to a doctor's office to hand out business cards and brochures. The office mangers told Olmos that its office staff had received a "directive from [the hospital] that they should no longer refer patients to Dr. Yang for surgery due to the fact she was suspended and under investigation for fraud."  She then went to five other doctor's offices, who all told her the same things.  Olmos also stated that "[s]ince March 2016, various administrators from [the hospital] . . . have each cancelled one or more of Dr. Yang's scheduled surgeries . . . .  Each would then call me claiming that [the hospital's medical staff director] had told them Dr. Yang wasn't privileged to perform the scheduled surgery/procedures [and] was potentially incompetent to perform the surgery,

4

or was performing Plastic Surgeries and that she was intentionally trying to deceive the insurance providers and the hospital."

Stephanie Townsend, a nurse practitioner who has worked with Yang, described two April 2016 incidents: "On April 17, 2016, Dr. [Emily K.] Rekue asked me if Dr. Yang was under investigation or if she was suspended for doing something wrong. I said 'no, why?' Dr. Rekue said that she had been told by [the hospital] administration not to do any more surgeries with Dr. Yang and, especially, not have her name included on any charts or records with Dr. Yang because Dr. Yang is being investigated and being associated with Dr. Yang could hurt Dr. Rekue's practice and she could even be investigated." Townsend also stated: "In April of 2016, following a surgery performed by Dr. Yang, I was called into an impromptu meeting with Donna Siefert, (Operating Room, Director) and Sandra Martin, (Director, Quality Dept.) in which Sandra Martin asked me if I've ever witnessed Dr. Yang performing an abdominoplasty under the guise of a hernia repair, or if I've ever witnessed Dr. Yang doing anything improper, illegal, unethical, or fraudulent, all the while implying that Dr. Yang is under investigation. Sandra Martin said Dr. Yang would be facing serious charges once the 'cat is out of the bag[.']" Both Yang and Katherina Jimenez, a surgical technician, made the same statement about Martin's April 2016 questioning. Steven E. Catlett, who refers patients to Yang, stated that "[i]n March of 2016, I heard Dr. Yang was suspended and/or under investigation."

In their reply, defendants reiterated their original arguments and argued, based on the declarations Yang submitted, that the cause of action was time-barred.

The trial court denied the motion, holding that the cause of action was not based on statements made in connection with a peer review proceeding, that it does not arise from the exercise of free speech rights about a matter of public interest, and that "even if the statements are protected," Yang has established a probability of prevailing on the merits. (Underlining omitted.)

## II.  ANALYSIS

"The procedure made available to defendants by the anti-SLAPP statute has a distinctive two-part structure.  [Citations.]  A court may strike a cause of action only if the cause of action (1) arises from an act in furtherance of the right of petition or free speech 'in connection with a public issue,' and (2) the plaintiff has not established 'a probability' of prevailing on the claim.  [Citation.]" (*Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 619 (*Rand Resources*).)  "A defendant satisfies the first step of the analysis by demonstrating that the 'conduct by which plaintiff claims to have been injured falls within one of the four categories described in subdivision (e) [of section 425.16]' [citation], and that the plaintiff's claims in fact *arise* from that conduct [citation]." (*Id.* at p. 620.)  "If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success. . . . [The court's inquiry at this second step] is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to

6

sustain a favorable judgment." (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788 (*Monster Energy*).) "The Legislature has decreed that courts 'broadly' construe the anti-SLAPP statute to further the legislative intent of encouraging 'continued participation in matters of public significance' by preventing the chilling of such participation 'through abuse of the judicial process.'" (*Kibler*, *supra*, 39 Cal.4th at p. 199, citing § 425.16, subd. (a).)

"We review de novo the grant or denial of an anti-SLAPP motion. [Citation.] . . . In addition to the pleadings, we may consider affidavits concerning the facts upon which liability is based. [Citations.] We do not, however, weigh the evidence, but accept the plaintiff's submissions as true and consider only whether any contrary evidence from the defendant establishes its entitlement to prevail as a matter of law. [Citation.]" (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1067.)

As we explain, defendants' statements are protected activity under the anti-SLAPP statute because they were made in furtherance of their right to free speech in connection with an issue of public interest. Moreover, Yang fails to show a probability of prevailing because any cause of action for defamation based on the specific statements she identifies are barred by the statute of limitations. The anti-SLAPP motion should therefore have been granted.

7

A.  *Protected Activity*

Defendants contend that Yang's defamation cause of action falls under subdivisions (e)(2) and (e)(4) of the anti-SLAPP statute.  We find that the latter provision applies, so we need not address the former.

Section 425.16, subdivision (e)(4) (subdivision (e)(4)) protects "any other conduct in furtherance of the exercise of . . . the constitutional right of free speech in connection with a public issue or an issue of public interest."  In *FilmOn*, our Supreme Court held that under this provision, "a court must consider the context as well as the content of a statement in determining whether that statement furthers the exercise of constitutional speech rights in connection with a matter of public interest." (*FilmOn*, *supra*, 7 Cal.5th at p. 149.)  Specifically, the inquiry calls for its own two-step analysis:  "First, we ask what 'public issue or [] issue of public interest' the speech in question implicates—a question we answer by looking to the content of the speech. [Citation.]  Second, we ask what functional relationship exists between the speech and the public conversation about some matter of public interest.  It is at the latter stage that context proves useful." (*Id.* at pp. 149-150.)  We refer to these as the "public issue" and "functional relationship" steps.

In this case, the content of the speech, as indicated by both the allegations in the complaint and the affidavits submitted in opposition to the motion, show that the public issue implicated is the qualifications, competence, and professional ethics of a licensed physician.  As Yang alleges, defendants told others that she was not "qualified or competent," that she "rendered care below applicable standards of practice," that her

8

"ethics" were "below acceptable standards," and that she was "dangerous" to her patients and others. These clearly implicate Yang's qualifications, competence, and professional ethics. Olmos's statement that hospital administrators told her Yang was "performing surgeries she was not privileged to perform," "was potentially incompetent" to perform certain surgeries, and "intentionally trying to deceive the insurance providers and the hospital," among other actions, similarly raise these characteristics. Whether or not a licensed physician is deficient in such characteristics is, we hold, a public issue. (See *Kibler*, *supra*, 39 Cal.4th at p. 201 [in exercising "primary responsibility for monitoring the professional conduct of physicians licensed in California," hospitals, through their peer review committees, "oversee 'matters of public significance,' as described in the anti-SLAPP statute"]; *Healthsmart Pacific, Inc. v. Kabateck* (2016) 7 Cal.App.5th 416, 429 ["members of the public, as consumers of medical services, have an interest in being informed of issues concerning particular doctors and health care facilities"].)

We therefore disagree with *Dual Diagnosis Treatment Center, Inc. v. Buschel* (2016) 6 Cal.App.5th 1098 (*Dual Diagnosis*) to the extent it suggests the qualifications of a local healthcare provider are not a public issue. There, the court held that statements concerning the "licensing status of a single rehabilitation facility" did not fall under subdivision (e)(4) because it was not a public issue. (*Dual Diagnosis*, *supra*, at p. 1105.) That case, however, was decided years before, and therefore without the benefit of, our Supreme Court's opinion in *FilmOn*.

9

Regarding functional relationship, *FilmOn* stated that subdivision (e)(4) "demands 'some degree of closeness' between the challenged statements and the asserted public interest." (*FilmOn*, *supra*, 7 Cal.5th at p. 150; see also *Rand Resources*, *supra*, 6 Cal.5th at p. 625 [rejecting the proposition that "any connection at all—however fleeting or tangential—between the challenged conduct and an issue of public interest would suffice to satisfy the requirements [subdivision (e)(4)]" because "[a]t a sufficiently high level of generalization, any conduct can appear rationally related to a broader issue of public importance"].) As the court stated, "'it is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate.'" (*FilmOn*, at p. 150.) "What it means to 'contribute to the public debate' [citation] will perhaps differ based on the state of public discourse at a given time, and the topic of contention," but ultimately "we examine whether a defendant—through public or private speech or conduct—participated in, or furthered, the discourse that makes an issue one of public interest." (*Id.* at pp. 150-151.)

Here, Yang's allegations that defendants informed her "patients" and the "general public" that she was generally unqualified, as well as Olmos's statement that the hospital had directed several doctors to "no longer refer patients" to Yang "due to the fact she was suspended and under investigation for fraud," demonstrates that defendants directly participated in and contributed to the public issue.

This is so for two reasons. For one, as Yang alleges, the defamatory statements were communicated to the public, not just to discrete doctors or hospital staff members.

This context is significant, because speech to the public about a doctor's qualifications furthers the public discourse on that matter. (See *FilmOn*, *supra*, 7 Cal.5th at pp. 153-154 [DoubleVerify's reports did not fall under subdivision (e)(4) in part because "DoubleVerify issues its reports not to the wider public . . . but privately, to a coterie of paying clients"].)

Secondly, the hospital's directive that doctors should no longer refer patients to Yang is similar to a statement made by a third party to aid and protect consumers, the latter of which has consistently been held to constitute protected activity under the anti-SLAPP statute. (See, e.g., *Chaker v. Mateo* (2012) 209 Cal.App.4th 1138, 1146; *Carver v. Bonds* (2005) 135 Cal.App.4th 328, 343-344; *Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 900.) Defendants telling doctors to not refer patients to Yang is akin to consumer protection information in that defendants ostensibly seek to protect the patients' interests. If anything, such statements about a medical provider are more readily categorized as contributing to a debate on a public issue than are statements aiming to protect consumers' purchasing of a product (i.e., protecting their commercial or financial interests), given that an individual's health and safety are more directly implicated with medical services. (See *Healthsmart Pacific, Inc. v. Kabateck*, *supra*, 7 Cal.App.5th at p. 429 ["If [a doctor] and facilities with which he is affiliated are or have been engaged in wrongful conduct toward patients, the public has an interest in being informed about such conduct."].) Stating that a doctor should not have patients referred to her because she is unqualified and unethical is not a "slight reference to the broader

11

public issue" of physicians' qualifications (*FilmOn*, *supra*, 7 Cal.5th at p. 152); rather, it directly contributes to the discourse by contending a physician lacks those qualifications.

Yang does not discuss or cite *FilmOn* in her respondent's brief, despite its relevance to the subdivision (e)(4) analysis and the fact *FilmOn* was decided months before she submitted it. Rather, Yang contends that defendants' statements do not fall under subdivision (e)(4) because they do not directly impact a broad segment of society. Given that statements aimed at protecting groups of consumers have been viewed as sufficiently broadly applicable to be protected, we think it clear that statements aimed at protecting members of the public who might see a doctor are sufficiently broadly applicable. In any event, the consideration of whether a defendant engaged in "'conduct that could directly affect a large number of people beyond the direct participants'" implicates only a "*nonexclusive*" category within subdivision (e)(4). (*Rand Resources*, *supra*, 6 Cal.5th at p. 621, italics added.) As noted, under *FilmOn*, the dispositive inquiry tasks us with first identifying the public issue implicated and then asking whether a sufficient functional relationship exists between the speech and that interest. (*FilmOn*, *supra*, 7 Cal.5th at pp. 149-150.) Here, given the audience and nature of defendants' statements, we hold that such a relationship exists, and that therefore subdivision (e)(4) applies.

B. *Probability of Prevailing*

As noted, when a defendant makes the required showing at the first step, "'the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a

probability of success.'" (*Monster Energy Co.*, *supra*, 7 Cal.5th at p. 788.) In evaluating this second step, "'[t]he court does not weigh evidence or resolve conflicting factual claims. Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law.'" (*Ibid.*) However, "a plaintiff seeking to demonstrate the merit of the claim 'may not rely solely on its complaint, even if verified; instead, its proof must be made upon competent admissible evidence.'" (*Ibid.*) "[S]peculative inferences not supported by the evidence proffered need not be considered." (*Id.* at p. 795.)

Yang cannot establish a probability of success here because any cause of action for defamation based on a statement supported by evidence is time-barred.

A cause of action for defamation must be filed within one year of when the cause of action accrues. (§ 340, subd. (c); *Shively v. Bozanich* (2003) 31 Cal. 4th 1230, 1246 (*Shively*).) "[A] cause of action for defamation accrues at the time the defamatory statement is 'published,'" and "publication occurs when the defendant communicates the defamatory statement to a person other than the person being defamed." (*Shively*, *supra*, at p. 1247.) Here, Yang's declaration, as well as the declarations of others submitted with her opposition, indicate that Yang bases this cause of action on statements defendants made no later than 2016. For instance, Yang states that she "first learned of defendants' false statements that [she] was 'under investigation'" for "insurance fraud"

13

and "doing Plastic Surgery without permission" "in or about March-April 2016." Olmos states that, in March 2016, several doctors' offices informed her that they were told to no longer refer patients to Yang because "she was suspended and under investigation for fraud." Townsend stated that, in April 2016, a doctor had been told by the hospital to not do "any more surgeries" with Yang because Yang was "being investigated." Yang, Townsend, and Jimenez all described an April 2016 where a hospital director implied that Yang was "under investigation" and "would be facing serious charges once the 'cat is out of the bag.'" Catlett stated that "[i]n March of 2016, I heard Dr. Yang was suspended and/or under investigation."

Thus, the evidence substantiates only statements made in 2016, but Yang did not file her complaint until June 2018. Moreover, although sometimes a defamation cause of action does not accrue until a plaintiff *learns* of the defamatory statement (see *Shively*, *supra*, 31 Cal.4th at p. 1248), this cause of action would be time-barred even if we were to apply this rule, as Yang tells us she discovered the substance of the defamatory statements "in or about March-April 2016." The trial court therefore erred when it applied the discovery rule and held that it could not "determine as a matter of law that the claim is barred by the statute of limitations."

Yang's only contention regarding the statute of limitations is that the complaint and declarations "specify that defendants' wrongful conduct[], including the defamation, continues to the date of the filing of the [c]omplaint." The complaint alleges, for instance, that defendants' wrongful conduct commenced in March 2016 and continues

14

"through and including the present time," and in her declaration, Olmos states that "[*s*]*ince* March 2016, various administrators from [the hospital] have . . . cancelled" Yang's surgeries based on untrue assertions, and that "[*s*]*ince* March of 2016" Olmos has had "numerous conversations" with hospital administrators in which she was told of the defamatory statements. These, however, do not constitute evidence that any defamatory statement was made within the one-year period leading up to the filing of Yang's complaint: the first is merely an allegation (as opposed to evidence), and Olmos's statements support no more than a speculative inference that any defamatory statement was made in 2017 or later. Put another way, the only statements for which "'competent admissible evidence'" has been offered were all made in 2016. (*Monster Energy Co.*, 7 Cal.5th at p. 788.) Any cause of action based on them is thus time-barred.

## III. DISPOSITION

The trial court's order denying defendants' special motion to strike is reversed. The trial court is directed to enter a new order granting the motion. Defendants are awarded their costs on appeal.

CERTIFIED FOR PUBLICATION

RAPHAEL
J.

We concur:

MCKINSTER
            Acting P. J.


SLOUGH
            J.