Filed 9/13/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| KELLY LI, | B326887 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. 22SMCV00604 |
| JEFF JENKINS et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County. Mark A. Young, Judge. Affirmed.

Cameron Stracher, LLP, Cameron Stracher, Sara Tesoriero; Howard M. Rupp and H. Marc Rupp for Defendants and Appellants.

Weinberg Gonser Frost, Christopher Frost, John Maatta, Ashley Morris, Weixuan Cai; and Frost, LLP for Plaintiff and Respondent.

———————————————

## SUMMARY

This case presents the question whether conduct that occurred during the creation and development of a popular television series was "conduct in furtherance of the exercise of the constitutional right . . . of free speech in connection with a public issue or an issue of public interest" within the meaning of the catchall provision of the anti-SLAPP (strategic lawsuit against public participation) statute. (Code Civ. Proc., § 425.16, subd. (e)(4); further statutory references are to section 425.16.)

We conclude, adhering to the two-part test announced in *FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133 (*FilmOn*), that while the creation of a television show is an exercise of constitutionally protected expression, in this case there is no "functional relationship" between the activity challenged in the complaint and the issue of public interest, as required by *FilmOn*. Accordingly, we affirm the trial court's order denying defendants' anti-SLAPP motion to strike plaintiff's complaint.

## FACTS

### 1. The Complaint

Plaintiff Kelly Li sued defendants Jeff Jenkins, Jeff Jenkins Productions, LLC, and Bongo, LLC, for breach of contract and eight other causes of action. Plaintiff's complaint alleged she conceived the idea for and worked to develop and coproduce a popular television program that came to be known as Bling Empire on Netflix.

In the spring of 2018, plaintiff presented the idea for the program to defendant Jenkins during a series of discussions, and she gave Jenkins written development material concerning the program. The two worked together for several months to refine

2

the concept and develop the program. Plaintiff introduced most of the principal cast to Jenkins.

Plaintiff and Jenkins entered into an agreement on May 2, 2018, by which they "agreed to work together for the development and the potential production of an unscripted or digital project." Under the agreement, if the project was " 'set-up' " with a buyer, Jenkins and his designees were to be executive producers and, subject to buyer approval, plaintiff "shall be attached as an executive producer." Plaintiff was to be available "to render all reasonable services . . . to enable [Jenkins] to develop, shop and otherwise produce the Project." Plaintiff was to secure the participation of certain individuals and to work with Jenkins to secure other participants.

Under the terms of the contract, plaintiff "was to receive both a fixed fee and contingent compensation." She was "entitled to receive an episodic fee in the amount of twenty-five percent (25%) of one hundred percent (100%) of Jenkin[s]'s executive producer fee for each episode produced[,] together with a five percent (5%) annualized increase. Additionally, [plaintiff] was to receive contingent compensation in the amount of 20% of 100% of the Modified Adjusted Gross received and retained [by] Jenkins [from] the Project or from any derivative work."

The agreement entitled plaintiff "to receive an 'executive producer' credit on each episode of the Production on which [plaintiff] renders and completes all services as reasonably required by [Jenkins]." The agreement also provided plaintiff "shall be afforded meaningful consultation over all key creative matters."

The complaint alleged the term of the May 2, 2018 agreement was for one year, but if Jenkins were in active

3

negotiation with a buyer at the end of the term, "the Agreement would be extended for the time necessary to conclude such negotiation. An agreement with a Buyer was entered into during the term of the Agreement."

The complaint further alleged that on May 7, 2019, plaintiff and Jenkins executed another agreement "that on its face is stated to be 'as of' February 11, 2019. That Agreement set forth the terms under which [plaintiff] was to perform on-camera services on the Program. Notwithstanding the fact that the February 11, 2019 Agreement was an agreement that was concerned with [plaintiff's] on-camera services there is one line in the Agreement that confirms and ratifies, without any condition or reservation, the obligation owed to [plaintiff] under the May 2, 2018 Agreement, and states: [Plaintiff] shall be attached as an 'Executive Producer'."

Plaintiff's complaint alleged defendants breached both agreements "by excluding and failing to [p]rovide [plaintiff] with the ability to fully perform services as an Executive Producer and specifically excluding her as an Executive Produce[r] and from inclusion in decisions and the ability to work or consult on the Program." Defendants failed to compensate plaintiff and give her credit in the program as specified in the agreement. Plaintiff further alleged that absent defendants' material misrepresentations and omissions, she "would not have allowed Defendant Jenkins access to her materials, nor would she have participated in the development and production process, and never would have acquiesced to the sale of her property to Netflix."

Based on the same facts, plaintiff alleged causes of action for breach of the implied covenant of good faith and fair dealing,

4

intentional and negligent misrepresentation, fraudulent inducement, and other claims.

**2.     The Anti-SLAPP Motion, Opposition and Reply**

Defendants responded with an anti-SLAPP motion, contending plaintiff's claims arose "from acts in furtherance of the right of free speech about matters of public interest" under section 425.16, subdivision (e)(4) (hereafter, § 425.16(e)(4) or the catchall provision).

Defendants contended all of plaintiff's claims arose from defendants' alleged actions in creating and developing the program, which are acts in furtherance of free speech rights. They further argued the program "involves an issue of public interest." They explained the program "has been one of the most-watched reality, docu-follow television series on Netflix"; it "focuses on the lives of young, wealthy Asian-Americans living in Los Angeles" and the idea for it grew out of the success of the movie, Crazy Rich Asians; it "offers a unique view of Asian-Americans and the issues they face as they navigate life in Los Angeles"; it is " 'helping to start new conversations about what Asians can look like or be doing on TV' "; and "[b]eneath the Program's glitz and gossip . . . is a commentary on class in America, an exploration of the tensions inherent between assimilation and heritage, and an education in the ethnic nuances of East Asian high society in Los Angeles."

Defendants also contended plaintiff could not establish a probability of prevailing on her claim because the May 2, 2018 contract expired, was not enforceable, and was superseded by a later agreement in which plaintiff signed a release.

Plaintiff's opposition contended, among other things, that while the creation of the content for a television show is protected

5

speech, the conduct alleged in plaintiff's complaint does not " 'further the public conversation on an issue of public interest,' " as required in *FilmOn*, and so did not qualify for statutory protection under the catchall provision. Plaintiff also argued she made a prima facie showing sufficient to sustain a favorable judgment, pointing to correspondence suggesting that the later agreements defendants cited were not intended to deprive her of the benefits of the May 2, 2018 agreement.

In their reply, defendants did not mention *FilmOn,* but argued their alleged wrongful conduct "is inextricably connected to Defendants' protected activity in developing the Program," and "[a]ccordingly, the public interest requirement of section 425.16(e)(4) has been met."

### 3. The Trial Court Ruling

Citing *FilmOn* and other cases, the trial court denied defendants' anti-SLAPP motion. The court concluded: "While Defendants demonstrate[] some public interest in the subject of the Program itself, Defendants do not show a functional relationship between the challenged conduct—the decision to exclude and not compensate Plaintiff as an Executive Producer on the Program—and any public interest in the Project or the Project's themes. Certainly, this decision does not [aid] or meaningfully contribute to the social issues cited."

Because the court found defendants did not carry their threshold burden, the court did not consider whether plaintiff had demonstrated her claims had at least minimal merit.

Defendants filed a timely appeal.

## DISCUSSION

### 1. The Law

A defendant may bring a special motion to strike any cause of action "arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue . . . ." (§ 425.16, subd. (b)(1).) When ruling on an anti-SLAPP motion, the trial court employs a two-step process. The moving defendant bears the initial burden of establishing that the allegations or claims " ' "aris[e] from" protected activity in which the defendant has engaged. [Citations.] If the defendant carries its burden, the plaintiff must then demonstrate its claims have at least "minimal merit." ' [Citation.] If the plaintiff fails to meet that burden, the court will strike the claim." (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 884.)

Our review is de novo. (*Geiser v. Kuhns* (2022) 13 Cal.5th 1238, 1250 (*Geiser*).)

As relevant here, defendants must establish the conduct alleged in the complaint was protected under the catchall provision, which includes "any . . . conduct in furtherance of the exercise of the constitutional right . . . of free speech in connection with a public issue or an issue of public interest." (§ 425.16(e)(4).) *FilmOn* directed courts to use a two-part test to determine whether the activity from which a lawsuit arises falls within section 425.16(e)(4)'s protection. (*FilmOn, supra,* 7 Cal.5th at pp. 149–150.)

*FilmOn* requires courts to consider "the context as well as the content of a statement in determining whether that statement furthers the exercise of constitutional speech rights in

7

connection with a matter of public interest." (*FilmOn, supra,* 7 Cal.5th at p. 149.) "First, we ask what 'public issue or . . . issue of public interest' the speech in question implicates—a question we answer by looking to the content of the speech. (§ 425.16, subd. (e)(4).) Second, we ask what functional relationship exists between the speech and the public conversation about some matter of public interest. It is at the latter stage that context proves useful." (*FilmOn,* at pp. 149–150.)

*FilmOn* explained that "the second part of the test moves from a focus on identifying the relevant matters of public interest to addressing the specific nature of defendant's speech and its relationship to the matters of public interest." (*FilmOn, supra,* 7 Cal.5th at p. 152.) The court "agree[d] . . . that 'it is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate.' " (*Id.* at p. 150.) The context of the speech— whether it was private or public, to whom it was said and for what purpose, the identity of the speaker, the audience sought – —helps courts decide whether the speech in question "contributes to or furthers the public conversation on an issue of public interest." (*Id.* at pp. 149–150, 154.)

**2.     This Case**

Here, the first step of the *FilmOn* inquiry is not at issue. As the court explained in *Geiser*, "*FilmOn*'s first step is satisfied so long as the challenged speech or conduct, considered in light of its context, may reasonably be understood to implicate a public issue, even if it also implicates a private dispute. Only when an expressive activity, viewed in context, cannot reasonably be understood as implicating a public issue does an anti-SLAPP motion fail at *FilmOn*'s first step." (*Geiser, supra,* 13 Cal.5th at

8

pp. 1253–1254.)  The creation and development of a popular television series that presents the issues defendants describe (see *ante,* at p. 5) "may reasonably be understood to implicate a public issue" (*Geiser,* at p. 1253), and the trial court accordingly found that plaintiff's claims "generally arise from Defendants' alleged actions in creating and developing" the program.  Indeed, plaintiff concedes "the creation of a television show is a matter of public interest, broadly speaking."

But "implicat[ing] a public issue" is not enough to pass the *FilmOn* test for conduct protected under section 425.16(e)(4). That requires an affirmative answer to the second question, "whether the activity contributed to public discussion of that issue." (*Geiser, supra,* 13 Cal.5th at p. 1246; see also *Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 625 ["we reject the proposition that any connection at all—however fleeting or tangential—between the challenged conduct and an issue of public interest would suffice to satisfy the requirements of section 425.16, subdivision (e)(4)"; "[a]t a sufficiently high level of generalization, any conduct can appear rationally related to a broader issue of public importance"].)

The conduct plaintiff identified in her complaint consisted of excluding her as an executive producer, excluding her from decisions and consultation on the program, and failing to compensate and credit her as agreed.  (See *ante,* at p. 4.)  While this liability-producing conduct arose, in the broadest sense, from defendants' activity during creation and development of a popular television program, the challenged conduct had no "functional relationship" to the public issue it implicates, i.e., the program's focus on the lives of young, wealthy Asian-Americans and the issues they face as they navigate life in Los Angeles.  On

9

the contrary, the challenged activity did nothing to contribute to public discussion of the program or the themes it presents, as required by *FilmOn* and *Geiser*.

Defendants resist this conclusion, insisting we must focus on "the entire context" in which their conduct arose and not merely on the " 'private context' in which the May 2018 Agreement was made." We agree. But defendants do not explain how their challenged conduct itself contributed to or furthered the public discourse on the program or its themes. Defendants recite only generalities, such as that the "concept and material" for which plaintiff alleges she was not properly compensated "are intertwined with the Program's focus on public interest issues related to the Asian-American experience." That does not meet the *FilmOn* standard.

Defendants rely on two cases, contending the circumstances here are comparable to one of them (*Ojjeh v. Brown* (2019) 43 Cal.App.5th 1027 (*Ojjeh*)) and distinguishable from the other (*Musero v. Creative Artists Agency, LLC* (2021) 72 Cal.App.5th 802 (*Musero*)). These cases are applications of *FilmOn*'s principles, but neither of them supports a different conclusion from the one we reach. Here, what is absent is " 'some degree of closeness' " (*FilmOn, supra,* 7 Cal.5th at p. 150) between the challenged conduct and the asserted public interest.

In *Ojjeh,* the court found the complaint targeted conduct falling within section 425.16(e)(4): "Specifically, defendants' solicitation of investments from plaintiff [to produce a documentary film on the refugee crisis in Syria] and their performance of allegedly unsatisfactory work on the uncompleted documentary constituted activity in furtherance of their right of free speech in connection with an issue of public interest." (*Ojjeh,*

10

*supra,* 43 Cal.App.5th at p. 1032.)  The court found the complaint targeted protected speech and conduct.  (*Id.* at pp. 1038–1040.)

*Ojjeh* then concluded the defendants' conduct in furtherance of the exercise of free speech "was 'in connection with' a public issue or issue of public interest."  (*Ojjeh, supra,* 43 Cal.App.5th at pp. 1042, 1043–1044.)  The court recited evidence from the defendants describing how the film might best generate empathy and raise public awareness of the plight of Syrian refugees.  (*Id.* at pp. 1043–1044.)  The court found the defendants' work on the proposed documentary "constituted an 'attempt to participate in a larger public discussion' [citation].  Content-wise, defendants' efforts in obtaining the interview footage of individuals affected by and involved in the refugee crisis and in maintaining an online journal of refugees' stories *were directly related to the asserted issue of public interest and were undertaken to contribute toward the public discourse on the matter.*"  (*Id.* at p. 1044, italics added.)

No such connection is demonstrated here.

Defendants say plaintiff's claims "arise from [their] development and production" of the program, and their conduct "involves the parties' discussions surrounding the creation of a television program."  Defendants say their decisions concerning who would be involved creatively in the program were "a necessary part" of the development and production of the program.  We fail to see how a private decision not to compensate plaintiff, to exclude her from creative participation in, and to deny her credit for a television program "contributes to public discussion" of the Asian-American experience reflected in the program.

11

Defendants also discuss and distinguish *Musero*, but that case does not assist them either.  In *Musero*, a writer sued his former talent agents, alleging they misappropriated his creative work on a proposed television pilot and used the material in the development of a competing project with another client.  (*Musero, supra,* 72 Cal.App.5th at p. 808.)  The *Musero* court agreed "the challenged conduct arises from protected speech activity" (*ibid.*), observing that "[c]reating a television show is an exercise of constitutionally protected expression" (*id.* at p. 816).  But the court found that "when the context and content of the specific allegedly wrongful statements are considered, their degree of connection to a topic of public interest is insufficient to warrant protection under section 425.16, subdivision (e)(4)."  (*Id.* at p. 808.)

In *Musero,* the plaintiff's pilot script involved a fictional female attorney general, and the competing project focused on the professional and personal life of former attorney general Eric Holder.  (*Musero, supra,* 72 Cal.App.5th at pp. 821–822.)  The court summarized by stating that "the creative aspects of his work that [the plaintiff] claims [a defendant] misappropriated, privately communicated to a targeted audience of one, whatever its purported impact on [the other writer's] work, did not contribute to the public conversation about a matter of public interest."  (*Id.* at p. 822.)

*Musero* tells us that the existence of some public interest in the subject of a television program itself is insufficient, standing alone, to demonstrate the necessary "closeness" or any functional relationship between the challenged conduct—here, the exclusion of plaintiff from participation in the project and the failure to compensate and credit her as executive producer—and any public

12

interest in the program or its themes.  Indeed, this case presents a classic example of an attempt to " 'defin[e] [a] narrow dispute by its slight reference to the broader public issue.' " (*Musero, supra,* 72 Cal.App.5th at p. 820, quoting *FilmOn, supra,* 7 Cal.5th at p. 152.)

In sum, the conduct challenged, while it "implicate[s]" a public issue, does not "contribute[] to public discussion of that issue" (*Geiser, supra,* 13 Cal.5th at p. 1246).  Consequently, defendants' activity excluding plaintiff and failing to compensate her was not undertaken "in furtherance of free speech 'in connection with' an issue of public interest." (*FilmOn, supra,* 7 Cal.5th at p. 154.)

## DISPOSITION

The trial court's order denying defendants' anti-SLAPP motion to strike plaintiff's complaint is affirmed.  Plaintiff shall recover her costs on appeal.

GRIMES, J.

WE CONCUR:

STRATTON, P. J.

VIRAMONTES, J.

13