Filed 4/19/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| ROBERT DUBAC, | B317061 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. 20SMCV02019 |
| v. | |
| SANDRA ITKOFF et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Mark H. Epstein, Judge. Affirmed.

Rosen Saba, Todd M. Lander and Michael J. Peng for Plaintiff and Respondent.

Brown, White & Osborn and Kenneth P. White for Defendants and Appellants.

_____

In a six-unit building, one couple kept emailing insults about their neighbor. For anti-SLAPP purposes, this quarrel was

not speech in connection with a public issue.  Code cites are to the Code of Civil Procedure.

I

We recount facts.

A

Robert Dubac owned a condominium in the same six-unit building as Sandra Itkoff and Jonathan Diamond.  We spell out nine statements by Itkoff and Diamond that Dubac claimed were actionable.  (See *Geiser v. Kuhns* (2022) 13 Cal.5th 1238, 1252–1256 [context is important] (*Geiser*).)  The statements present the perspective of Itkoff and Diamond, who assert the bad blood with Dubac dated from before 2015, when they complained Dubac discriminated "against them because they are Jewish and their daughter is African-American."  Dubac maintains all their charges are false.

*Statement one.*  On May 2, 2020, Itkoff and Diamond orally told an insurance carrier that Dubac was "self-dealing on the backs of other homeowners."

*Statement two.*  On June 14, 2020, at 8:26 a.m., Itkoff and Diamond sent an email titled "Re: HOA insurance" to Dubac's wife and to the board of the homeowners association.  This email asked whether "a claim [has] been made against this policy as we have requested repeatedly."  We quote the balance of this message, without corrections but with our italics:

"There is a long list forming of continued illegal and damaging acts by this HOA:  records issues, audit issues, theft and other financial errors, mismanagement and self-deail issues.  [⁋]  We have pointed these wrong doings out.  They have not been addressed and continue.  In addition, the same board member, Robert Dubac, who has been *acting in bad faith and in a raciest,*

2

continues to run the HOA.  [¶]  He must be replaced.  [¶]  These new illegal actions of the past 3 years must be addressed by the insurance company given they are being ignored by this HOA.  [¶] Yours, Sandy and Jonathan."

Dubac's suit claimed the statements that he was acting in bad faith and was a racist were actionable.

*Statement three.*  On July 3, 2020, at 4:47 p.m., Itkoff emailed Dubac, copying Dubac's wife and other residents of the condominium building, four of whom were named Mike Goedecke, Steve Kloves, Chris Carter, and Laura Peterson.

The title of this message was "Not HOA business."  The message's uncorrected text follows.  The italics are ours.

"*This has nothing to do with the HOA at this point, this is between you and me.*  [¶]  This just came up in the car AGAIN -- it does a lot these days because all of you have acted just like the others in the news, and Rosie points it out.  [¶]  *You are a racist son of a bitch*, just like all those KARENS out there with their white privilege and lack of any sense of who they really are.  *You are a racist son of a bitch.*  You made my beautiful Rosie cry on so many nights.  For some reason you thought it was ok to film her, report her to the police, blame plumbing issues (that had her sleeping on our floor for a year) on her gorgeous African curls, look the other way when sewage kept entering her room, toss over her plant and then kill it in the garage, state that she stuffs 'all sorts of crap' down the toilet, state that her sweet sweets for the neighbors were poison.  [¶]  *Not only are you a racist son of a bitch - but you act out your hate and disappointment with life on a child.*  You and Goedecke are too unselfaware to understand your own actions - he calls the police and tells them we have a gun, also a KAREN move.  I guess the intent was to have them show

3

up at our door guns drawn...perhaps shoot the black girl, she may be an intruder. [¶] And you others - Chris Carter & Steve Klovis - stand by and watch. Laura Peterson says to Rosie's face, I won't help stop it, let alone apologize for it. [¶] You wonder why Rosie's school counsels and essays are filled with your names - this is why. [¶] You want to know why we will always seek truth and justice when dealing with you all - this is why. This is the fire in our belly. You hurt both my babies. Squandered Leo's medical school funds and hurt Rosie in ways she will remember until death. [¶] I tried to help us all move beyond this, but you refused to participate. [¶] Keep lying to the City, we won't. [¶] Sandy"

Dubac's complaint alleged this message was actionable for several reasons, including that it falsely accused Dubac of harassing and abusing a child and of doing so out of racial animus.

*Statement four.* On July 9, 2020, at 3:20 p.m., Diamond and Itkoff sent an email to one Brian Murphy, as follows, uncorrected but with underlining omitted and italics added.

"Dear Brian, [¶] As the only director of our homeowners' association not a party to the issues outlined below, we are writing to you to meet and confer per the Davis Stirling Act internal dispute resolution requirements (IDR). [¶] We believe that Bob Dubac and Mike Geodecke are not fit to be members of this board, act as the designated security officer, or inspector of elections, pursuant to the Davis Stirling Act/California Code clearly defined requirements for carrying out these positions of responsibility. We seek: To elect a board and assign HOA responsibilities to individuals who carry out those responsibilities and treat other members in an ethical, legal and unbiased manner. [¶] When we meet and confer, we will provide you with

4

evidence showing that *multiple false police reports were filed against our family, by Bob Dubac against our minor black daughter* after surreptitiously filming her on the street from the trunk of his car, and by the Geodecke's claiming we have a gun, an absolute recipe for a tragic disaster for our family. [₱] These are actions Association member Steve Kloves called 'absurd' in court documents. These are criminal actions, considered a crime against justice itself, taken directly against our family and are not actions fitting someone who is to hold any HOA position of responsibility. These are positions that oversee the safety and livability of our HOME, our largest financial asset, and the wellbeing of our children, unlike Amy Cooper who was immediately fired from her position overseeing an insurance portfolio at Franklin Templeton, far removed from the victim of her crime. [₱] We will also share other false reports, numerous so we will select a representative few, made to other government officials/agencies trying to elicit harm to our family and illegally advance the interest of others including themselves. [₱] On multiple occasions, in addition to those described above, *Dubac has weaponized his white privilege against our black daughter starting from the time she was 10 years old. His behavior has been the topic of many school conferences*, essays and poems. We will also provide you evidence of these other occurrences that also render him unfit. [₱] In consultation with the Los Angeles chapter of Black Lives Matter, we have a better understanding of our rights and we have their support to pursue these rights vigorously. [₱] Please advise when you are able to meet. [₱] Yours, [₱] Jonathan Diamond and Sandy Itkoff."

Dubac alleged this statement "represented (again falsely) that an educational institution had actually conducted multiple

conferences on the subject of Dubac and his purported racially motivated biases."

*Statement five.* On July 23, 2020, at 3:24 p.m., Itkoff sent an email to Dubac and his wife titled "Just like Rep. Yoho." We reproduce its text with our italics and without corrections.

"*You accoust women with no remorse.* [¶] *You make sure Rosie can not live her life with dignity.* [¶] This issue is not about one incidence. [¶] Dehumanizing language is not new for you, it is a pattern. [¶] Clearly you don't want to apologize, you have no remorse. We have given you the opportunity and you have not taken it. [¶] You use your wife as a shield. [¶] Having a wife does not make a decent man. When a decent man messes up, he apologizes. He apologizes not to save face, but to repair and acknowledge the harm he has done so we can all move on. [¶] Your disrespect for both me and Rosie is everywhere apparent, and we will not accept it. You have given permission to other men, like Goedecke, permission to behave this way to women, to my Rosie."

Dubac alleged this email was actionable because it accused him of accosting women and ensuring a child could not live her life with dignity.

*Statement six.* On August 12, 2020, at 8:26 p.m., Diamond and Itkoff sent a lengthy email addressed to "HOA and Board." This email began by asserting a record of successes that Diamond and Itkoff had achieved against their homeowners association. "We don't chase you all for the petty, childish and harassing actions you carry out. When *Dubac steals our mail, a federal offense*, we try to get it back and then move on. . . . When Lisa Goedecke, Lauren Dubac, and *Bob Dubac make false police reports*, we inform the police and ignore it. [¶] *Dubac's malice,*

6

stupidity, ego, and insecurity are a lethal combination. *He has wreaked havoc* in this building and *in the life of Rosie Diamond* .... [⁋] And so we continue with the sophomoric, the petty, and the illegal antics of this HOA - [⁋] Best, Jonathan & Sandy."

Dubac complained this email falsely accused him of malice, filing false police reports, stealing mail, and wreaking havoc on their daughter's life.

*Statement seven.* On September 13, 2020, at 9:52 a.m., Diamond and Itkoff emailed Brian Murphy and others. In part and without corrections, this email stated "Given we have now logged 137 evidence-supported incidents where *Bob Dubac* (and Lauren) *has lied underoath* in *his attempts to* curry favor with other owners, *enrich himself,* and demean and *defraud Sandy and Rosie* to feed his personal trauma, perhaps you can answer these very clear and straightforward questions that have been outstanding for some time."

Dubac's complaint alleged this email falsely claimed he had committed perjury "with the intention of enriching [himself] and defrauding Defendants and their daughter."

*Statement eight.* On October 8, 2020, at 11:08 a.m., Diamond and Itkoff sent an email titled "More Bullshit" which Dubac said described "[m]ore crazy from the racist, misogynist HOA [President Dubac]." The trial court stated its understanding that an email from Diamond and Itkoff did exist—Diamond and Itkoff admitted sending it—with language accusing Dubac of racism and misogyny, but a correct copy of that email "has not been presented to this Court."

*Statement nine.* On October 21, 2020, at 1:21 p.m., Itkoff and Diamond emailed two association land use consultants, the building manager, Dubac and his wife, building residents, and a

7

Santa Monica city planning official concerned with the building. The email contained the following text, which we have not corrected but to which we have added italics.

"In addition, this man, *Bob Dubac*, with full complicity by his wife Lauren Dubac, *is a pathological liar*, he doesn't know the difference between truth and lies. In a pattern that is straight out of a psychology textbook, his response is to accuse everyone else of lying. Whatever he does, he accuses everyone else of doing the same. This was in full display at the HOA meeting this week as Mr. Dubac kept mansplaining an anxious Ms. Dubac with lies and spin. [¶] Narcissists need scapegoats to blame shift because they cannot accept responsibility, criticism, blame or accountability (narcissistic injury). [¶] It started with blaming a plumbing problem on 10 year old Rosie's hair and grew from there. But this is not a new situation to the Dubacs. They have a long history of this kind of behavior - the abused abuse. [¶] If it stems from *Bob Dubac's abuse as a child* as Lauren states, that is a very unfortunate start in life, and similar to Donald Trump. But, the Dubacs are adults now and should have sought help. Lauren's warning to us is not sufficient, she's an enabler and takes her orders from Mr [¶] And you all, you remain silent, complicit as well. [¶] Follow the rules. Be honest."

Dubac's complaint stated this email falsely accused him of being a pathological liar and "peddl[ed] outrageous and obscene lies about Dubac's childhood."

B

Dubac sued Itkoff and Diamond for defamation, infliction of emotional distress, interference with economic advantage, and civil harassment. Itkoff and Diamond filed a special motion to strike. The trial court rendered a meticulous 30-page statement

8

of decision.  It ruled statements one, three, five, and eight failed the first prong of anti-SLAPP analysis, which here required a showing the statements were "speech in connection with a public issue or an issue of public interest."  (§ 425.16, subd. (e)(4).)  On the second prong of analysis, the trial court found Dubac succeeded in showing a likelihood of prevailing on his claims, except for statement nine and part of statement two.

In sum, most of Dubac's claims got through.  The trial court struck statement nine and part of statement two, but these rulings are not before us because Dubac did not appeal.  Itkoff and Diamond appealed the court's refusal to strike the balance of Dubac's suit.

## II

The anti-SLAPP statute aims to encourage participation in matters of public significance.  (§ 425.16, subd. (a); *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 59-60.)  The decision in *Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 883-885 (*Wilson*), for instance, reviews the two-prong anti-SLAPP analysis.  We affirm the trial court order against the challenge by Itkoff and Diamond.

## A

This case turns on the first prong of the anti-SLAPP analysis, which here requires independent review of whether these statements count as "speech in connection with a *public issue* or *an issue of public interest*."  (§ 425.16, subd. (e)(4), italics added; see *Geiser, supra,* 13 Cal.5th at p. 1250.)  In oral argument, Itkoff and Diamond attempted to invoke other parts of this statute, but they forfeited those arguments by failing to develop them in their opening papers.

The statutory phrases "*public issue*" and an "*issue of public interest*" seem to refer to the same thing: it is difficult to imagine a "public issue" that is not an "issue of public interest," and vice versa. Our parties do not distinguish between these two phrases, so any difference does not matter here. We simplify by referring interchangeably to "public issues" and "issues of public interest."

B

California's anti-SLAPP jurisprudence has "struggled" to define what makes something an issue of public, rather than private, interest. (*Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 621 (*Rand*).) It has been a struggle because the distinction between "public" and "private" is notoriously difficult to state in clear and simple terms. (Cf. Horwitz, *The History of the Public/Private Distinction* (1982) 130 U.Pa. L.Rev. 1423 [tracing history of distinction from medieval times]; see *id.* at p. 1426 ["By 1940, it was a sign of legal sophistication to understand the arbitrariness of the division of law into public and private realms"].)

Ambiguity about the "public interest" is far flung in the law. (E.g., Brotman, *Revisiting the Broadcast Public Interest Standard in Communications Law and Regulation* (March 23, 2017) BROOKINGS <https://www.brookings.edu/articles/revisiting-the-broadcast-public-interest-standard-in-communications-law-and-regulation/> [as of April 18, 2024], archived at <https:// perma.cc/2KAY-CCAZ> [the mandate to regulate broadcasting consistent with the "public interest, convenience, and necessity" remains a pillar of communications law, yet its precise meaning remains opaque and elusive].)

On some points, however, judges have "ably" distilled the characteristics of a public issue. (*Geiser, supra,* 13 Cal.5th at p.

10

1248.)  Five factors generally tend to make a statement implicate a public interest:

1. The statement concerns a person or entity in the public eye;
2. the statement concerns conduct that could directly affect a large number of people beyond the direct participants;
3. the statement concerns a topic of widespread public interest;
4. the issue is of concern to a substantial number of people; or
5. the issue has been the subject of extensive media coverage.  (*Ibid.*)

Factor three is of limited utility because it uses the word "public" to define the word "public."

Factors two, three, and four, on the other hand, repeat variations on a consistent theme:  they stress the significance of how *many* people are affected by, or are interested in, a purportedly public issue.

In addition to stating these five factors, the *Geiser* decision also emphasized the importance of considering contextual factors, including the identity and *number* of speakers, the audience, the location of the communication, and the purpose and timing of the communication.  (*Geiser, supra,* 13 Cal.5th at p. 1253.)

The ultimate question is whether a statement "furthered public discussion of the public issues it implicated."  (*Geiser, supra,* 13 Cal.5th at p. 1255.)

*Geiser* clarified that, while the first prong of anti-SLAPP analysis could itself be subdivided into sub-steps, it might be "efficient" in some cases to combine the sub-steps into one

inquiry. (*Geiser, supra,* 13 Cal.5th at p. 1256.) We follow this efficient practice here.

C

*Content* and *context* show the emails from Itkoff and Diamond did not contribute to discussion of public issues.

The *content* of the emails shows a personal feud with neighbor Dubac, not an exchange contributing to public discussion of public issues. Itkoff and Diamond thought Dubac had treated their daughter badly. They had other allegations too—Dubac stole their mail, ran the homeowners association poorly, was a narcissistic liar, and so forth—but the dominating theme was their daughter's mistreatment. This topic, while of vital concern to the parents, was—in context—not an issue of public interest.

The *context* of the emails shows they did not contribute to public discussion of public issues. We have explained important contextual factors include the (1) identity and number of speakers, (2) the audience, (3) the location of the communication, and (4) the purpose and timing of the communication. (See *Geiser, supra,* 13 Cal.5th at p. 1253.) We examine each factor.

1

The identity and number of speakers show the matter was not a public issue. The speakers' *identities* were as neighbors in a diminutive community. The *number* of speakers likewise was small. Itkoff and Diamond were in a building with five other units. The smallness of the group suggests issues plaguing it are private, not public.

2

The confined *audience* for the messages suggested they did not contribute to public discussion of a public issue. Itkoff and

12

Diamond never sent these messages to the general public or to a sizable portion of it. Message one was to a single person: an insurance carrier. That conversation appeared to be one-on-one: entirely private in the conventional sense of the word. Message two was to Dubac's wife and the board of this small homeowners association. Message three, titled "*Not HOA business*"—our emphasis—was to Dubac personally, with copies to Dubac's wife and the four other households in the building. Message four was to a director of the homeowners association. Message five was to Dubac and his wife. Message six was to members of the building's association and the building manager. Message seven was again to a director of the association, with copies to Dubac, his wife, the building manager, and other households in the building. Message eight was to building residents and the building manager. Message nine was to association consultants, the building manager, Dubac and his wife, building residents, and an official concerned with the building.

The general public did not and could not know about this intra-building tiff. The audience was always tiny. It was never the "public."

3

The *location* was messages from owners of one unit to others living in (or linked to) one lone building. The emails themselves were composed on computers inside the building, protected from the public by locked doors and laptop passwords. As far as the general public was concerned, these messages were secret and private—quite different from, for instance, the noisy street picketing at issue in *Geiser*. (See *Gieser, supra,* 13 Cal.5th at pp. 1243 & 1244 [street picketers held signs, sang songs, gave speeches, and chanted that the corporate CEO could not "hide"].)

13

4

The *purpose* and *timing* of the emails show they did not contribute to public discussion of anything.  Itkoff and Diamond had the evident purpose of confronting Dubac, shaming him, making him repent, and enlisting a few others in their campaign.  Itkoff and Diamond sent their messages at various times throughout the day, from 8:26 a.m. to 8:26 p.m., apparently at their convenience or whim and not in reaction to a specific triggering event of public import.  (Cf. *Geiser, supra*, 13 Cal.5th at p. 1253 [street protest timed to target, and in immediate response to, corporate action].)

D

Itkoff and Diamond attempt to elevate their name-calling by saying it was in service of the governance of a homeowners association.  They imply anything touching upon a homeowners association is per se a public issue.  This is incorrect.

1

An objective observer might be puzzled to hear a homeowners association can be the stage for public debate of a public issue.  Homeowners associations in some sense are the opposite of "public":  they are intensely private; you must buy your way in, often at high cost, to a place that excludes the general public.  The point of the organization is to exercise control over private property to which the public has no right of access.

But any kind of collective governance can call forth another notion of "public," which is that *group* control differs from strictly *individual* power.  Homeowners associations can be a type of small-scale democracy, where people meet in something like a

14

town hall and, through discussion and voting, settle differences and decide their collective fate. This has a sort of "public" aspect.

This aspect, however, suffers a problem. All "private" organizations govern themselves in some collective way: clubs, hobby groups, sports teams, and so on. Every bridge foursome and chess club has *some* way to decide when and where to meet, whom to include, and what rules to follow. Is all this private ordering and governance really "public"? To read "public" so broadly would tend to make most things "private" into something "public." And expanding "public" to include every bridge group would tend to drain all content from a word of limitation. This method of statutory interpretation is unsound. (E.g., *People v. Arias* (2008) 45 Cal.4th 169, 181.)

There have to be limits. Case law supplies some guidelines.

2

Some lower courts have treated some decisionmaking by large homeowners associations as "public." (E.g., *Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 478–479 [association issue affecting over 3,000 people was "public"]; *Ruiz v. Harbor View Community Assn.* (2005) 134 Cal.App.4th 1456, 1461, 1468–1469 [523 lots]; *Cabrera v. Alam* (2011) 197 Cal.App.4th 1077, 1081–1082, 1091 [228 condominiums]; *Lee v. Silveira* (2016) 6 Cal.App.5th 527, 539, 549 [440 town houses]; *Colyear v. Rolling Hills Community Assn. of Rancho Palos Verdes* (2017) 9 Cal.App.5th 125, 132-134 [about 755 households].)

Case law rejects the notion, however, that *every* issue within a homeowners association is a public issue. (*Talega Maintenance Corp. v. Standard Pacific Corp.* (2014) 225 Cal.App.4th 722, 734 ["the issue of who was to pay for the

15

repairs, which was of interest to only a narrow sliver of society, was not a public issue"].)

In other words, merely relating a controversy in some way to a homeowners association does not make it a contribution to public discussion of a public issue.  This is a variant of the familiar rule that one cannot abstract one's way to a "public" issue.  (E.g., *Geiser*, *supra*, 13 Cal.5th at p. 1250 [defendants always succeed in drawing a line—however tenuous—between their speech and an abstract issue of public interest].)

3

A line of cases rejects efforts to elevate personal squabbles into "public" issues.

The landmark lower court decision is *Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122 (*Weinberg*).  Our Supreme Court repeatedly has endorsed *Weinberg*.  (See *Geiser*, *supra*, 13 Cal.5th at p. 1248; *FilmOn.com Inc v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 149; *Rand, supra*, 6 Cal.5th at p. 621.)

*Weinberg* established the significance of considering whether the issue is of concern to a substantial number of people. (See *Geiser*, *supra*, 13 Cal.5th at p. 1248, citing *Weinberg, supra,* 110 Cal.App.4th at pp. 1132–1133.)  "[A] matter of public interest should be something of concern to a substantial number of people. . . .  Thus, a matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest." (*Weinberg, supra,* 110 Cal.App.4th at pp. 1132.)

*Weinberg's* facts were instructively similar to this case. *Weinberg* involved a dispute between two men who shared an interest in collecting tokens.

Private governance was at work among the token collectors in *Weinberg*.  Both men belonged to the National Token

16

Collectors' Association, which published a monthly newsletter called Talkin' Tokens. This association had about 700 members. The local association was the Western States Token Society, with about 50 members. Alan Weinberg had been a member of the national association since its inception in 1997. Duane Feisel was a member and secretary of the national association and president of the western states association. (*Weinberg*, *supra*, 110 Cal.App.4th at p. 1127.)

Feisel accused Weinberg of stealing one of his tokens. He went on an extended campaign to oust Weinberg from token associations and jamborees. Using the Talkin' Tokens newsletter and other means, Feisel called Weinberg a thief and a chronic liar and claimed Weinberg had a violent temper. (*Weinberg*, *supra*, 110 Cal.App.4th at pp. 1127–1129.)

Feisel was eloquent about how his attacks on Weinberg connected to a supposedly public issue. Feisel said he was "warning others of a suspected theft, so they can secure their property from the alleged wrongdoer, [thus serving] the public interest in deterring crime and protecting the interests of others who could suffer such harm." (*Weinberg*, *supra*, 110 Cal.App.4th at p. 1126.)

Yet when Weinberg sued Feisel for defamation and emotional distress, the Court of Appeal affirmed the trial court's denial of Feisel's special motion to strike. A key factor was that the communications in the case were among only "a small group of other private parties." (*Weinberg*, *supra*, 110 Cal.App.4th at p. 1132.) Feisel's attacks on Weinberg were *not* matters of public interest. They were merely efforts to gather ammunition for another round of private controversy. (*Id.* at pp. 1132–1133.)

4

Courts have applied *Weinberg*'s teaching to a variety of other name-calling disputes that were essentially private. These precedents support our analysis.

In one case, an episode of road rage led to fisticuffs and horrible name-calling. (*Abuemeira v. Stephens* (2016) 246 Cal.App.4th 1291, 1296.) Presiding Justice Gilbert wrote this "unseemly private brawl" involved "private, anonymous" parties and raised no public issue. (*Id.* at pp. 1294 & 1298; see also *D.C. v. R.R.* (2010) 182 Cal.App.4th 1190, 1199 & 1226 [one student posted hateful and threatening online comments about another; no public issue]; *Bernstein v. LaBeouf* (2019) 43 Cal.App.5th 15, 19, 24 [drunken patron insulted bartender; no public issue].)

A similarly private dispute between neighbors was *Workman v. Colichman* (2019) 33 Cal.App.5th 1039. Donna Sue Workman's house was in escrow until neighbor Paul Colichman caused the sale to fall through by emailing Workman's real estate agent that he was planning an addition that would interfere with the view from Workman's house. Workman sued, saying the statement was false, no construction was planned, and Colichman was just trying to interfere with the pending sale. Colichment filed a special motion to strike, saying his email involved a matter of public interest. The court rejected this claim, saying "[i]nformation about the views from a private residence affecting only those directly interested in buying or selling that house is not an issue of public interest." (*Id.* at p. 1042.)

We encounter more feuding neighbors in *Jeppson v. Ley* (2020) 44 Cal.App.5th 845, where one's dog killed another's cat. Relations went downhill from there, resulting in a supposedly

anonymous but not-very-well-concealed neighborhood blog post from one about the other that pulled in a related assault against another neighbor's tree. This dispute affected only three households: the dog owner, the cat owner, and the tree owner. It did not involve a public issue. It was "strictly local." (*Id.* at pp. 856–857.)

In the same vein was *Woodhill Ventures, LLC v. Yang* (2021) 68 Cal.App.5th 624, 627, where a bakery customer unhappy with a birthday cake unleashed a tirade against the bakery that culminated in death threats to the bakers. The bakery sued. The cake controversy did not raise a public issue. (*Id.* at p. 636.)

Our result today gains support from these cases where people became enveloped in conflicts they saw as transcendent but that did not involve public issues.

5

The number of people affected by, involved in, or who care about this intra-building name calling is minute. The record offers no objective basis for saying anyone outside the building had any "public" interest in this poisoned relationship between neighbors. A matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest. (*Weinberg, supra*, 110 Cal.App.4th at p. 1132.) Dubac's lawsuit did not concern "speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).) This fact doomed the special motion to strike. We do not consider anti-SLAPP prong two. (See *Wilson, supra*, 7 Cal.5th at p. 884.)

//

//

//

19

## DISPOSITION

We affirm the trial court's order and award costs to the respondent.


WILEY, J.


We concur:


STRATTON, P. J.


VIRAMONTES, J.